488 P.2d 741

**Hazel O. SANFORD, Plaintiff and Respondent,**

**v.**

**UNIVERSITY OF UTAH, an agency of the State of Utah, Defendant and Appellant.**

**No. 12167.**

Supreme Court of Utah.

Sept. 15, 1971.

6. Maki v. Frelk, 40 Ill.2d 193, 239 N.E.2d 445 (1968) ; 57 Am.Jur.2d, Negligence, Sec. 428, p. 849.

Raymond M. Berry, of Worsley, Snow & Christensen, Salt Lake City, for defendant-appellant.

Fredrick S. Prince, Jr., Salt Lake City, for plaintiff-respondent.

CALLISTER, Chief Justice:

Plaintiff initiated this action to recover for the damages caused by the flooding of her property. She alleged that the University of Utah, the adjoining upper landowner, constructed certain public improve-

ments, which were in a defective, unsafe or dangerous condition and caused the flooding of her property. Plaintiff recovered judgment upon a jury verdict, and defendant appeals.

Plaintiff's home is located at 8 North Wolcott Avenue in Salt Lake City, Utah. The University of Utah received title to the adjoining easterly property from the federal government in 1948. Although defendant's land was at a higher elevation, plaintiff introduced evidence indicating that the natural drainage was in a northerly direction. Defendant's land was graded and filled in certain sections and the Merrill Engineering Building was constructed with a parking lot. In addition, a curving peripheral road, connecting Federal Way to Wasatch Boulevard, was located on defendant's land, to facilitate travel to the Medical Center. Subsequent to the creation of these improvements, the drainage was in a westerly direction.

In June of 1963 plaintiff's home was flooded, for which she was compensated. She expressed concern about future floods, and on January 10, 1965, she received a letter from James C. Fletcher, President of the University of Utah, wherein he stated:

I have investigated the flood potential in the area and am assured by competent engineers that the drains are ample to take care of the situation. Also we are taking steps to see that the drains are kept clear and clean so that flood conditions will not be caused by inability of the water to go through the drain channels.

I am sure that you will appreciate that the great expanse of grass which has been planted since the time of the flood situation to which you referred will act as a strong retardant to a similar situation arising again. Also I wish to assure you that we will be particularly vigilant in seeing that optimum conditions are maintained.

On July 17, 1967, during a rainstorm, a veritable waterfall came cascading off the parking lot, over the roadway and down the hillside, smashing plaintiff's windows and filling her basement with water and mud. The jury awarded plaintiff damages for personal property that was destroyed, for the costs of repair to her home and yard, and for a diminution in market value of her property resulting from the past history of flooding.

Plaintiff predicated her claim for relief under Secs. 8 and 9 of the Utah Governmental Immunity Act, Title 63, Chapter 30, U.C.A.1953, as amended 1965.

Sec. 63–30–8 provides:

Immunity from suit of all governmental entities is waived for any injury caused by a defective, unsafe, or dangerous condition of any highway, road,

street, alley, crosswalk, sidewalk, culvert, tunnel, bridge, viaduct or other structure located thereon.

Sec. 63–30–9 provides:

Immunity from suit of all governmental entities is waived for any injury caused from a dangerous or defective condition of any public building, structure, dam, reservoir or other public improvement. Immunity is not waived for latent defective conditions.

On appeal, defendant urges that Sec. 10 of the Act modifies Secs. 8 and 9, and that under the Act, a governmental entity is not liable for a defective or dangerous condition causing injury, unless the condition was caused by a negligent act or omission of an employee committed within the scope of his employment. Defendant's appeal is premised on the aforementioned statutory construction, and based thereon, it argues that the alleged defective condition was not caused or created by any person under the supervision and control of the University; and, therefore, the institution is not liable. The peripheral road was designed and constructed by the Utah State Road Commission. The Merrill Engineering Building and the parking lot were designed and constructed under the supervision of the Utah State Building Board. At the time of the 1967 flood, Gibbons and Reed Construction Company was enlarging the parking lot.

Defendant contends that these agencies were independent contractors over whom the University had no supervision or control in the design or construction of the drainage system. Defendant asserts that an employer of an independent contractor is not liable for the negligence of the independent contractor to third persons, and the plaintiff should have proceeded against the State Road Commission, State Building Board, and Gibbons and Reed Construction Company.

Defendant further urges that the trial court erred by its failure to instruct the jury concerning negligence of employees of the University in accordance with the theory propounded by defendant under Sec. 10.

Defendant further asserts that there has been no waiver of governmental immunity, since the alleged defective condition was caused by conduct within the purview of the statutory exceptions specified in subsections 1 and 4 of Sec. 10.

Sec. 63–30–10 provides:

Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of his employment except if the injury:

(1) arises out of the exercise or performance or the failure to exercise or

perform a discretionary function, whether or not the discretion is abused, or

\* \* \* \* \* \*

(4) arises out of a failure to make an inspection, or by reason of making an inadequate or negligent inspection of any property, \* \* \*

Defendant urges that the design and construction of the drainage system were discretionary functions for which immunity was not waived. In the alternative, defendant contends that the University did not have an affirmative duty to inspect its property to locate the defective or dangerous condition created by an independent contractor.

Finally, defendant asserts that the Governmental Immunity Act does not provide for waiver of immunity for claims arising from maintaining a nuisance.

The trial court instructed the jury that plaintiff to prevail must prove: (1) that before July 16, 1967, defendant in constructing improvements changed the natural flow for drainage of surface waters from its or surrounding property; (2) that in so doing it created a drainage system; (3) that the improvement thus created had a defective condition in (a) a culvert, and/or (b) in the public improvement itself, that was not a latent defective condition; (4) that defendant knew or in the exercise of reason-

able care should have known of the existence of either defective condition, if any; and (5) that such defective condition, if any, caused injury to the plaintiff.

The trial court ruled that a claimant to recover under Secs. 8 and 9 is not required to produce evidence to support a finding of negligent conduct of an employee that is actionable under Sec. 10. The court observed that the University had notice in 1963 that a dangerous condition existed by reason of a public improvement; that President Fletcher's letter was evidence of such notice of the condition. The trial court observed that the Governmental Immunity Act opened the door for recovery of damages caused by an intentional change of the natural drainage system of an area, whereby the flow is concentrated with damages resulting. The court ruled that claimant's right to recovery was based on the upper landowner's wrongful alteration of the natural drainage system without adequately protecting the lower landowners.

The trial court, in effect, in its rulings and instructions adopted the rule of "reasonable use": "each possessor [of land] is legally privileged to make a reasonable use of his land, even though the flow of surface waters is altered thereby and causes some harm to others, but incurs liability when his harmful interfer-

ence with the flow of surface waters is unreasonable." [1]

This jurisdiction has never specifically ruled as to which of the alternative doctrines (civil law rule, common enemy rule, or reasonable use rule) should determine the rights of landowners in regard to the discharge of surface waters, although there was a citation in footnote 1 in Reeder v. Brigham City [2] referring to the civil law rule. The outstanding analysis of Kinyon and McClure, Interference with Surface Waters, 24 Minnesota Law Review 891, 935, presents a convincing argument that the reasonable use approach which was adopted in Sec. 833, Restatement of the Law, Torts, is the preferable method to resolve those disputes where one possessor of land sustains harm in the use and enjoyment of his land as a result of another's use and enjoyment of other land. The authors indicated that under existing classifications the rules relative to surface waters are regarded as a branch of property law. They stated:

> * * * Whatever the reason, the consequence is that the legal relations of the parties have been stated almost invariably in terms of property concepts— rights, privileges, servitudes, "natural

easements" and so on. There is no question, however, that one's liability for interfering with surface waters, when incurred, is a tort liability. An unjustified invasion of a possessor's interest in the use and enjoyment of his land through the medium of surface waters, is as much a tort as a trespass or a private nuisance produced by smoke or smells. Nevertheless, the courts and writers seldom analyze the problems in terms of tortious conduct, causation or other tort concepts.

> * * * it should make little difference, so far as a satisfactory solution of surface water problems is concerned, whether the courts deal with the matter in terms of property rights or in terms of legal duties and tort liabilities. As a matter of fact, however, the property approach has not proved very successful, and is undoubtedly responsible for a substantial amount of the existing confusion in the law. [3]

The authors concluded:

> It is not suggested that the law of torts is perfect or that tort terminology is a panacea for all ills, * * *. Treating the matter as a question of tort lia-

1. Armstrong v. Francis Corp., 20 N.J. 320, 120 A.2d 4, 59 A.L.R.2d 413, 418 (1956); also see 59 A.L.R.2d Anno: Surface Waters-Drainage, Sec. 7, pp. 434–437; Sachs v. Chiat, 281 Minn. 540, 162 N.W.2d 243, 246–247 (1968).

2. 17 Utah 2d 398, 400, 413 P.2d 300 (1966).

3. At page 936 of 24 Minn.L.R.

bility, attention is focused on such practical and concrete problems as "the necessity of actual damage," "the reasonable or unreasonable character of the defendant's conduct in view of all the circumstances," and "the relative value of the interests involved," rather than on the limitations and qualifications of a categorical "right" or "servitude" presupposedly assumed and ill-defined.[4]

Since this issue is one of first impression in this jurisdiction, we have the opportunity to select the rule commended by Kinyon and McClure,[5] the rule of reasonable use. The Restatement of the Law, Torts, Sec. 833, provides:

Non-trespassory invasions of a person's interest in the use and enjoyment of land resulting from another's interference with the flow of surface water are governed by the rules stated in §§ 822–831.

In Comment a. following Sec. 833 there is an explanation that where one person drains or cultivates his land, grades it, builds roads, structures, or embankments upon it, he usually interferes with the flow of surface waters upon it or across it, and such interference often causes harm to a neighbor in the use and enjoyment of his land. Where the invasion is intentional, liability depends on whether the invasion is unreasonable.

An action for the invasion of a person's interests in the private use and enjoyment of land is an action for private nuisance.[6]

Any of three types of conduct may result in liability for a private nuisance. By far the greater number of such nuisances are intentional. Occasionally they proceed from a malicious desire to do harm for its own sake; but more often they are intentional merely in the sense that the *defendant has created or continued the condition causing the nuisance with full knowledge that the harm to the plaintiff's interests is substantially certain to follow.* * * * [Emphasis added.] [7]

The rulings and instructions of the trial court were in accordance with the foregoing rules of law. However, defendant asserts that there has been no waiver of immunity in regard to an action for a private nuisance.

* * * nuisance [private] is a field of tort liability, rather than a type of tortious conduct. It has reference to the

4. At page 939 of 24 Minn.L.R.

5. Also see Prosser, Law of Torts (3d Ed.) pp. 603–604.

6. Restatement of the Law, Torts, Chap. 40, Scope and Introductory Note, p. 220.

7. Prosser, Law of Torts (3d Ed.), Sec. 88, p. 595.

interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion. The attempt frequently made to distinguish between nuisance and negligence, for example, is based upon what the defendant has done rather than the result which has followed, and forgets completely the well established fact that negligence is merely one type of conduct which may give rise to a nuisance. * *

* * * Today liability for nuisance may rest upon an intentional invasion of the plaintiff's interests, or a negligent one, or conduct which is abnormal and out of place in its surroundings, and so falls fairly within the principle of strict liability. * * *[8]

A survey of the statutory scheme in the Governmental Immunity Act reveals that in Secs. 7 and 10 the legislature waived immunity in regard to a particular type of tortious conduct by a particular class of people, namely, negligent acts or omissions by employees while in the scope of employment. In contrast, in Secs. 8 and 9, the legislature waived immunity in regard to certain interests invaded or harm or damages inflicted without reference to the type of conduct which caused the invasion. Sec. 63–30–2(6) provides:

The word "injury" means death, injury to a person, damage to or loss of property, or any other injury that a person may suffer to his person, or estate, that would be actionable if inflicted by a private person or his agent.

This broad definition of injury when construed in connection with the language of Sec. 9 indicates a legislative intent to include within the waiver of immunity an action for private nuisance insofar as the action is predicated on a dangerous or defective condition of a public improvement that unreasonably interferes with the use and enjoyment of the claimant's property.

█ Since the waiver of immunity in Secs. 8 and 9 encompasses a much broader field of tort liability than merely negligent conduct of employees within the scope of their employment, the legislature could not have intended that Sec. 10, including its exceptions, should modify Secs. 8 and 9, even though it be conceded that the negligent conduct of an employee might be involved in an action for injuries caused by the creation or maintenance of a dangerous or defective condition.

The judgment of the trial court is affirmed; costs are awarded to plaintiff. Plaintiff's cross-appeal for reinstatement of the sum deducted from the judgment by the trial court cannot be sustained because the trial court's denial of defendant's motions for a new trial and judgment notwith-

8. Prosser, Law of Torts (3d Ed.), Sec. 88, pp. 594–595.

standing the verdict were predicated upon this reduction in the jury verdict.

TUCKETT and HENRIOD, JJ., concur.

ELLETT, Justice (dissenting).

It seems to me that the trial court erred in instructing the jury.

He properly told the jury that the term "defective condition" meant a condition from which injury to those affected thereby might reasonably be anticipated. He thereby laid the foundation for a negligence concept. However, he completely abandoned any thought that negligence had anything to do with the case and refused to tell the jury that if the harm to plaintiff was occasioned by a vis major she could not recover.

In refusing to give any instruction requested by the defendant regarding the question of negligence on the part of the defendant, the trial court clearly indicated his belief that negligence was not a factor to be considered by the jury.

The facts of this case seem to justify a finding of negligence or the lack thereof on the part of the defendant. A road and parking lot were under construction. The grading had been completed, and gravel was being hauled prior to placing of the hard surfacing material on top. Adequate drains had been installed by competent engineers to carry off ordinary surface waters which might be expected to fall thereon. However, before the pavement could be applied, a downpour of 1.88 inches fell—most of it in less than one hour—washing gravel into the drains and thus causing the water to flow onto the lower land of the plaintiff.

Ordinarily the question of a vis major is for the jury to determine from the facts given in evidence. It would therefore seem that the question of whether or not the defendant should have foreseen a rainstorm of the proportions of the one which came and made temporary provision by screens or otherwise to prevent the washing of gravel into the drains would be a question to be determined by the jury (unless the defendant is to be held an insurer to prevent water from flowing onto plaintiff's land).

The law seems to be contrary to the way the trial judge presented it to the jury. If there was a defective condition, to-wit: one from which harm might reasonably have been anticipated, then an instruction on negligence and on vis major should have been given.

The following cases are in point: City of Valparaiso v. Spaeth, 76 N.E. 514 (Ind. 1905). There, plaintiff sued for damages occasioned by flooding. The defendant city set forth the defense of an unprecedented rainstorm. The trial court sustained a de-

murrer to that defense, and the appellate court reversed, saying:

> * * * What has been said above with respect to the duty of municipalities to provide means of escape for surface water in the improvement of its streets does not apply to unprecedented rainfalls; that is, to such downpours or · floods as may be known to have occurred, but are so. unusual and extraordinary as that prudent persons do not think of attempting to guard against them. Skillful construction of streets in this respect seems to mean that such side ditches, culverts, and outlets must be provided for surface water collected and diverted from natural ways as are sufficient to carry the waters that may, from experience and the previous history of the vicinity, be reasonably expected to fall, and which are not the result of a cloudburst or other rainstorm of extraordinary character. * *

In Smith v. Mayor, etc., of City of N. Y., 66 N.Y. 295 (1876), the plaintiff's land was flooded when the sewer overflowed following an unusually heavy shower. The judgment was for the defendant, and the appellate court affirmed in these words:

> * * * It is found upon sufficient evidence that the overflow was caused by a stoppage of the sewer with sand, dirt and refuse matter washed in from the street, and that at or just before the flooding of the plaintiff's premises, there was an unusually heavy shower of rain. There is no proof of any obstruction before that time. There being no fault in the construction of the sewer, causing the overflow, it was incumbent upon the plaintiff to show a neglect by the defendants to remove the obstruction after notice of its existence, or some omission of duty on the part of the city officers in looking after it and seeing that no obstruction occurred. * * * The city does not insure the citizen against damage from works of its construction, but is only liable as other proprietors, for negligence or willful misconduct. * *

The case of City of Peoria v. Adams, 72 Ill.App. 662 (1897), was one wherein the city was sued for injuries caused by the collapse of a building due to weakening of its foundation by reason of flooding occasioned by failure of the city to provide for carrying off surface waters. The Court of Appeals stated the law in the following language:

> * * * The rule is that the outlet must be of ample capacity to carry off all the water likely to be in it. But the rule is not applicable to an extraordinary and excessive rainfall, which is held to be *vis major*. Such infrequent and extraordinary occurrences cannot be foreseen and provided against, and for damages caused by them no one is responsible. [Citations omitted.]

To the same effect is the case of Allen et al. v. City of Chippewa Falls, 52 Wis. 430, 9 N.W. 284 (1881). Headnote 1 of that case reads:

A city, in grading its streets and constructing gutters thereon for carrying off surface water, is not bound to provide against extraordinary storms such as private persons of ordinary prudence do not usually anticipate and provide against.

Los Angeles Cemetery Assn. v. City of Los Angeles, 103 Cal. 461, 37 P. 375 (1894), was similar to the instant matter. Headnote 2 of that case states the law to be:

Where a city, under the superintendence of a competent engineer, builds a culvert sufficient to discharge the ordinary quantity of surface water flowing through a definite channel, it is not liable when, because of a flood caused by an unusually heavy rain, the culvert is unable to discharge the water, and lands are overflowed.

The instant matter is not a case of nuisance, nor is it one of diversion of surface waters. It is merely a case of flooding of plaintiff's land due to the stoppage of a drain which was neither negligently constructed nor inadequate for carrying off of the foreseeable amount of precipitation which would fall. The only trouble was that in constructing the road and parking lot there had to be an interval of time between the laying of gravel and the placing of the paving material on top of it; and during this interval of time a rainfall of unprecedented proportions fell, causing the damage of which the plaintiff complains.

The law is stated in Sec. 833, Restatement of the Law of Torts, as follows:

* * * Where one person * * * builds roads, * * * upon it, [his land] he usually interferes with the flow of surface waters upon or across it, and such interference often causes harm to a neighbor in the use and enjoyment of his land. That harm may arise from the backing up of water on the neighbor's land or from an increase in the flow thereon or from a change in its direction or velocity. It may be intentional or unintentional * * *. Where the invasion is not intentional, the liability of the person harmfully interfering with the flow of surface waters depends upon whether his conduct has been negligent, reckless or ultrahazardous, * * *. Where, however, the invasion is intentional, liability depends upon whether the invasion is unreasonable. * * *

The illustrations following the cited text make it clear that negligence is at the base of any cause of action.

No one could believe from the evidence in the instant case that the defendant intentionally directed the water onto the plaintiff's land. The question of negligence therefore must be presented to the jury by proper instructions.

Even if I could assume that negligence was not to be a factor in deciding this case, I would still dissent from the majority holding. If there were a defect in the construction of the road and parking lot, it was *latent* in that until a rain came which was heavy enough to wash the gravel into the drain, there was no defect at all. It is difficult for me to see how one can foresee a rain of unprecedented proportions far enough in advance to require a delay in putting gravel on a road. It seems difficult enough for professional forecasters to foresee even an ordinary rain for any length of time in the future.

Since the defect, if one there was, was latent, immunity from suit was retained by the very wording of Sec. 63–30–9, as cited in the prevailing opinion.

I would reverse the case and direct the trial court to enter judgment for the defendant. The least that should be done would be to reverse and remand for a new trial.

CROCKETT, Justice (dissenting).

It is not without some regret that I find myself unable to agree with the majority decision which affirms a jury verdict for a property damage which must have been distressing indeed to the plaintiff. Never-

theless, it does not necessarily follow that someone else must pay merely because a misfortune has befallen the plaintiff which inspires sympathy.[1] The burden can be shifted to another only if he has been guilty of a wrongful invasion of the plaintiff's rights, which caused the damage. Our concern should be not only with the immediate controversy, but whether the allowance of redress not properly grounded in law may open the "floodgates" to other litigation of the same character; and it is thus important that such a controversy be resolved by a court, or by a jury under correct instructions as to the law applicable thereto.

A distinction should be pointed out between the two bases upon which plaintiff's claim against the University for damage to her property might be predicated: (1) that it resulted from an intentional invasion of her property rights or (2) that it resulted from the defendant's negligence.

As to (1) above: I recognize the accuracy of the rule quoted in the main opinion from Dean Prosser relating to liability for the type of injury herein dealt with or an invasion of another's land which is:

\* \* \* intentional merely in the sense that the defendant has created

---

1. See statement in Watkins v. Utah Poultry & Farmers Cooperative, 122 Utah 459, 251 P.2d 663.

or continued the condition causing the nuisance *with full knowledge* that the harm to the plaintiff's interest is substantially certain to follow. * * *

This statement is essentially the same as Restatement of Torts, Sec. 825:

> An invasion of another's interest in the use and enjoyment of land is intentional when the actor
>
> (a) acts for the purpose of causing it; or
>
> (b) knows that it is resulting or is substantially certain to result from his conduct.

The comments to Sec. 825 point out that "It is not enough to make an invasion *intentional* that the actor realizes *or should realize* that his conduct involves a serious risk or likelihood of causing such an invasion." *Comment b,* which deals with continuing or recurrent invasions, states, "In such cases the first invasion resulting from the actor's conduct may be either intentional or unintentional, but when the conduct is continued after the *actor knows* that the invasion is resulting from it, further invasions are intentional."

An essential of the factual foundation for the plaintiff's claim was that the 21-inch pipe which was used to drain the area was inadequate. Because there had been a previous flooding condition, of which the University was aware as indicated, inter alia, by Pres. Fletcher's letter, there was a basis in the evidence for giving instructions covering an intentional invasion. However, the difficulty is that the instructions given did not clearly and accurately cover this theory for recovery. They did not direct the jury's attention to the question whether the defendant had "knowledge that the harm to plaintiff's interests was substantially certain to follow" as required by the rule quoted above. However, it did tell them that before they could find the University liable they must first find that:

> The defendant knew, *or in the exercise of reasonable care should have known* of the existence of either defective condition, if any (in either the culvert or other public improvement).

The fault in that instruction is that it fails to conform to the rule hereinabove referred to and approved in the main opinion by omitting the requirement that the defendant must be found to have created or continued the condition *with knowledge* that harm is "substantially certain to follow." Moreover, by the use of the emphasized phrase, "or in the exercise of reasonable care should have known," it imports an element included in the concept of negligence. Having done so, I think, it is regrettable that the trial court refused to submit the issue of the defendant's negligence, and give the properly requested

instructions, including defenses, relating to it. On that matter I am in agreement with what is said in Justice Ellett's dissent in demonstrating that the question of the defendant's negligence should have been submitted to the jury.

In view of the fact that the judgment is affirmed by the majority decision, it is perhaps unnecessary in this separate dissent, but for whatever value it may have, I further observe that in connection with a trial on the question of negligence, it is my opinion that there were other issues with respect to which the jury should have been permitted to determine the facts.

The first is whether this particular storm was one of such violent and unprecedented proportions that it was not something which the defendant in reasonable care and prudence should have been required to foresee and guard against. The other is correlated thereto: whether the defect in the drainage, if any, was a "latent defect," i. e., one which was not readily observable upon inspection, and thus one for which immunity was not waived (Sec. 63–30–9, U.C.A.1953).

These issues should be determined by the jury under proper instructions. I would therefore agree with the second alternative suggested by Justice Ellett: to remand for a new trial, but upon the issues as stated herein. (Emphasis added.)