Robert L. GLEAVE, Plaintiff and Respondent and Cross–Appellant,

v.

DENVER & RIO GRANDE WESTERN RAILROAD COMPANY, a corporation, and Utah Railway Company, a corporation, Defendants and Appellants and Cross–Respondents,

and

State of Utah, Department of Transportation, Defendant and Respondent.

Nos. 860057–CA, 860058–CA.

Court of Appeals of Utah.

Jan. 28, 1988.

Rehearing and Reconsideration Denied Feb. 22, 1988.

Robert J. Debry (argued), Robert J. Debry & Associates, Salt Lake City, for Robert L. Gleave.

E. Scott Savage (argued), Patrick J. O'Hara, Michael F. Richman, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, for Denver & Rio Grande Western R. Co.

William Bannon (argued), Paul Warner, Asst. Atty. Gen., Salt Lake City, for UDOT.

Before JACKSON, BENCH and GARFF, JJ.

## OPINION

JACKSON, Judge:

This action arises from a collision between an eastbound motor vehicle driven by Robert L. Gleave and an empty southbound coal train operated by an agent of the Denver & Rio Grande Western Railroad Company. The accident occurred at daylight on April 16, 1982, at the crossing of 1600 South Street in Springville, Utah, and the railroad tracks. Gleave suffered severe personal injuries, and his vehicle was demolished. He filed this personal injury action, and a jury awarded him damages of $425,140.00 against the defendants Denver & Rio Grande Western Railroad Company and Utah Railway Company, which we will refer to collectively as Rio Grande. The jury did not attribute any negligence to Gleave. Before trial, the Utah Department of Transportation ("UDOT") was dismissed from the case on sovereign immunity grounds.

Rio Grande's appeal presents three substantial issues:[1] (1) was Rio Grande relieved of its duty to Gleave because regulation and control of safety signals and devices at railroad-highway crossings is the state's "exclusive" preempted domain? (2) was Gleave negligent as a matter of law? and (3) did the trial court err when it dismissed UDOT on grounds of sovereign immunity? Gleave has cross-appealed on two points: (4) did the trial court erroneously grant Rio Grande's motion for a directed verdict on Gleave's claim for punitive damages? and (5) did the trial court err in denying prejudgment interest on Gleave's award of damages for lost future earnings and earning capacity?

We affirm the judgment.

## I. DUTY OF RAILROAD COMPANY

Rio Grande argues that "the joint jurisdiction of these state agencies [i.e., UDOT and its reviewing agency, the Utah Public Service Commission] over the signs and control devices at railroad crossings remains *exclusive* and a private party, such as a railroad, has no more right to change the traffic protection signs at a public railroad crossing, than it would to change any other signs on a public highway." Rio Grande's "exclusivity" conclusion is based on its interpretation of Utah Code Ann. §§ 54–4–15(2), (4) and 54–4–15.1 (1986).[2] In other words, Rio Grande claims it does not have any duty to the public because the duty has been *preempted* by the state. Gleave argues that it makes no difference who had the duty to install signs and signals at the collision crossing because that issue was not presented to the jury and because the jury decided that Rio Grande breached duties other than a duty to install better signs or control devices.

■ Rio Grande's attempt to hide behind the statutes motivates us to seek further. Does not our law impose a basic duty of reasonable care and prudence upon Rio Grande, regardless of any statutory duty?

---

1. Rio Grande also claimed it was entitled to have the jury instructed that it could reduce Gleave's damages if it found that he failed to mitigate his damages by not wearing a seat belt. That issue was recently resolved adversely to Rio Grande's position in *Hillier v. Lamborn*, 740 P.2d 300, 303–04 (Utah App.1987).

2. Utah Code Ann. § 54–4–15(2) and (4) (1986) provide:

(2) The department shall have the power to determine and prescribe the manner, including the particular point of crossing, and the terms of installation, operation, maintenance, use and protection ... of each crossing of a public road or highway by a railroad or street railroad, and of a street by a railroad or vice versa, and to alter or abolish any such crossing, to restrict the use of such crossings to certain types of traffic in the interest of public safety....

....

(4) The commission shall retain exclusive jurisdiction for the resolution of any dispute upon petition by any person aggrieved by any action of the department pursuant to this section.

Utah Code Ann. § 54–4–15.1 (1986) provides:

The Department of Transportation so as to promote the public safety shall as prescribed in this act provide for the installing, maintaining, reconstructing, and improving of automatic and other safety appliances, signals or devices at grade crossings on public highways or roads over the tracks of any railroad or street railroad corporation in the state.

We think so.  In the landmark case of *English v. Southern Pac. Co.*, 13 Utah 407, 45 P. 47 (1896), the railway company pressed the same argument.  The statute in question imposed upon railway companies the duty of ringing bells and sounding whistles when trains approached public crossings.  The railroad argued that timely operation of bells and whistles was sufficient and "no additional duty was imposed under any circumstances, [sic] to prevent injury."  *Id.* at 416, 45 P. at 49.  Enroute to adopting the general rule in *English*, the supreme court observed:

> [I]n some cases it has been held that before a jury will be warranted in saying, in the absence of any statutory direction to that effect, that a railroad company should keep a flagman or gates at a crossing, it must be shown that such crossing is more than ordinarily hazardous ...

*Id.* at 419, 45 P. at 50.  But the court ended its analysis without embracing the "more than ordinarily hazardous" idea and held instead that the reasonable care and prudence to be used must depend upon the facts of each case.

> [W]hile the statutes of Utah make some provision for the safety of the public while crossing tracks when crossing over the public thoroughfares ..., yet these statutes will not relieve the railroad company from adopting such *other reasonable measures for the public safety as common prudence may dictate, considering the danger, locality, travel, and surrounding circumstances of the case.*

*Id.* at 420, 45 P. at 50 (emphasis added).

In *Bridges v. Union Pac. R.R. Co.*, 26 Utah 2d 281, 488 P.2d 738 (1971), plaintiffs focused on the *English* commentary and argued that the railroad company was negligent because the crossing was "more than ordinarily hazardous" and the company knew it but failed to install adequate signals to warn the public of danger.  Apparently intrigued by that argument, the *Bridges* court cited *English*, adopted the commentary, and expanded the holding:

> To authorize a jury to find negligence on the part of the railroad in not taking additional precautions, there must be evidence to indicate that the crossing was more than ordinarily hazardous, i.e., there must be something in the configuration of the land, or in the construction of the railroad, or in the structures in the vicinity, or in the nature or amount of the travel on the highway, or in other conditions, which renders the warning employed at the crossings inadequate to warn the public of danger.

*Id.* at 283, 488 P.2d at 739.  In a recent per curiam decision of the Utah Supreme Court, this language from *Bridges* was quoted.  *Hobbs v. Denver & Rio Grande W. R.R.*, 677 P.2d 1128, 1129 (Utah 1984).  Thus, the "more than ordinarily hazardous" doctrine rode the legal rails into railroad crossing negligence law in Utah, and we are required to apply that doctrine at this time.[3]

We believe Gleave more accurately describes what happened at trial.  The jury was specifically instructed that UDOT was statutorily given ultimate responsibility for crossing design and warning and safety devices and that, accordingly, it could *not* find Rio Grande negligent "based upon any defects which might exist with respect to the design of the 1600 South crossing or based upon any problems you may perceive in the lack of traffic warning devices"

---

**3.**  Although this doctrine is unnecessary and confusing, it makes no difference in the present case.  See the unpublished opinion of U.S. District Judge Bruce A. Jenkins in *Wilde v. Denver & Rio Grande W.R.R. Co.*, No. C–83–149J, slip op. at 16 (D.Ut. April 3, 1985) [Available on WESTLAW, 1985 WL 17370]:

> In conclusion, the court would be remiss if it did not express its criticism of the doctrine of the "more than ordinarily hazardous" crossing.  The Utah Supreme Court should, at its first opportunity, examine the doctrine with an eye to eliminating it.  The court believes that instructing a fact finder that it cannot find a railroad negligent for operating a train through a crossing without taking additional precautions unless it first finds that the warnings at the crossing were inadequate to warn the public adds nothing—except perhaps confusion—to an instruction that the railroad has a duty to operate its trains with reasonable care.  If the warnings are adequate, a jury would find that a reasonable person would not add additional warnings.  A special doctrine is not necessary.

there. The jury proceeded to find that the crossing in this case was "more than ordinarily hazardous." Once past that threshold, the jury was obligated to decide whether Rio Grande exercised reasonable care in driving the train across this roadway, given the crossing's design, its physical characteristics, and the existing warning signs.[4]

The statute relied upon by Rio Grande does not relieve it of the duty to operate trains with reasonable care, nor does it prohibit Rio Grande from exercising reasonable care in the operation of its trains and the maintenance of its right-of-way. Rio Grande cannot ignore the public peril at a more than ordinarily hazardous crossing and excuse itself until UDOT takes action to upgrade the safety devices at the 1600 South crossing. Rio Grande remains subject to a standard of reasonable care which, under the circumstances at this crossing, could require actions to reduce the risks imposed on the public.

■ Two experts testified that conditions at this crossing made it extraordinarily dangerous. Due to the crossing angle, a mound of earth, vegetation, and a curving track, a driver proceeding east on the road could see only 285' of track to the north when stopped at the existing stop sign. Rio Grande admitted before trial that the train that hit Gleave's car was travelling at 50 mph, the speed limit set by the railroad. A driver with the front end of his car even with the stop sign could not see a train moving at 50 mph (approximately 74' per second) until it was 4 seconds away from the crossing. Moreover, an audiologist testified that a train whistle would not warn a motorist until about 3 seconds before the train crossed the road. The whistle sound would be absorbed by the mound of earth and vegetation in the curvature of the track.

Rio Grande did install a stop sign to supplement the round yellow railroad crossing sign and the X-shaped crossbuck. But Rio Grande did not introduce evidence of other affirmative action to reduce the risks at this crossing, such as straightening the track, lowering the dirt mound, removing obstructive vegetation, or lowering train speed. The jury could thus reasonably find that Rio Grande breached its duty of reasonable care and was, therefore, negligent toward Gleave.

## II. EVIDENCE OF GLEAVE'S LACK OF NEGLIGENCE

■ In its special verdict, the jury specifically found no negligence on the part of Gleave. Rio Grande filed a motion for a new trial under Utah R.Civ.P. 59(a)(6), claiming that the evidence was insufficient to support this part of the verdict.

On appeal, the trial court's denial of Rio Grande's motion must be sustained if there is an evidentiary basis for the jury's decision. *Nelson v. Trujillo*, 657 P.2d 730, 732 (Utah 1982). Viewing the evidence in the light most favorable to the verdict, we will reverse the court's ruling only if "the evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust." *Id.* (quoting *McCloud v. Baum*, 569 P.2d 1125, 1127 (Utah 1977)).

Gleave testified that he pulled up to the stop sign and stopped his vehicle. He then looked to the left (north) and saw a dirt mound with weeds on it and 50–100' of track but no train approaching; then he looked to the right (south), where he saw no train in his unobstructed view three hundred yards down the track. Making his decision to proceed while still looking southward, he began moving his vehicle forward slowly and glanced back to the left, seeing the train rapidly bearing down on him and hearing its whistle for the first

---

4. [R]ights and duties of a traveler and of a railroad company at crossings are mutual and reciprocal.... [A] railroad company, merely because it is the favored traffic, [may not] carelessly and heedlessly operate its trains over crossings at an unusual and excessive speed and without giving adequate warnings, or create a misleading set of circumstances and rely upon the assumption that the traveling public may look out for their safety and keep out of the way of the trains.
*Toomer's Estate v. Union Pac. R.R. Co.*, 121 Utah 37, 58–59, 239 P.2d 163, 173 (1951).

time. At that point in time, which Gleave estimated was 2–3 seconds before impact, Gleave testified his car was 3–4' from the track. Deciding he could not cross the tracks safely in light of the train's speed, Gleave braked. But by the time the car stopped, it was approximately 1' from the track. Although he then tried to put the car in reverse, he was hit by the train before he succeeded in shifting gears because the train engine overhangs the track by considerably more than twelve inches.

Van Wagoner, an engineer who evaluates railroad crossing designs, testified that the one at 1600 South in Springville is the worst out of thousands of crossings he had seen that were controlled with stop signs. According to Van Wagoner, the stop sign creates an expectancy in drivers that, if they stop there, they will have sufficient visibility of any hazard to allow them to make a decision about proceeding and sufficient time to then proceed and clear the hazard. That expectancy is not met at the subject crossing because a driver stopped at the stop sign, who does not know the train's actual speed, can only see 285' up the track to the north. If the driver sees no train coming from that direction, the decision is made to proceed while continuing to be watchful for approaching trains. However, it takes a few seconds to react and make this decision, a few more for the car to accelerate, and a few more to move the car over the tracks and completely out of danger. According to Van Wagoner, this process takes 9.1 seconds from the stop sign, based on conditions at this crossing. Such a driver is 100 percent certain to be hit by a train moving at 50 mph (approximately 74' per second) if the train is fewer than 670' away from the crossing when the 9.1 second process begins. Even if the driver could cross the tracks in only 8 seconds, collision would be inevitable if the 50 mph train was any closer than 590' away when the process began. The driver is trapped because, by the time the 50 mph train is visible, there is

not enough time to continue and cross the tracks safely or to stop the car, change gears, and back up out of the train's path.

On appeal, Gleave does not deny that he had a duty to exercise reasonable care in operating his vehicle over the railroad crossing; instead, he says the evidence shows he carried out that duty.

> The law requires that a traveler, approaching a railroad crossing, look and listen, and, if necessary, stop to avoid being injured by trains. This is his duty at all times and on all occasions, whether his view be obstructed or unobstructed, and the greater the hazard or danger surrounding him, the greater is the care required of him.

*Lundquist v. Kennecott Copper Co.*, 30 Utah 2d 262, 266, 516 P.2d 1182, 1184 (1973). Rio Grande argues that Gleave's own testimony shows him to be negligent as a matter of law because he did not stop a second time at a point where he was close enough to the track to see further northward, but far enough from the track that a passing train would still clear the front end of his car.

> A plaintiff is contributorily negligent as a matter of law, if all reasonable minds would conclude that he failed to use the degree of care which an ordinary, reasonable, and prudent person would have observed for his own safety under the circumstances.

*Id.* at 266, 516 P.2d at 1185. Based on all the evidence in the record, we hold that Gleave's conduct was not negligent as a matter of law. All reasonable minds would not necessarily conclude that Gleave failed to exercise reasonable care under the circumstances he faced.

Van Wagoner testified that a driver who moved his car several feet beyond the stop sign and stopped with the front end at a spot 10' from the rail could still only see northward 285', resulting in no gain in sight distance.[5] From that spot, the "reaction, decision, acceleration, and clearance"

---

**5.** We note that Utah law requires a driver approaching a railroad crossing to stop "within fifty feet *but not less than ten feet from the nearest track* of such railroad" when an ap-

proaching train "is plainly visible and is in hazardous proximity to such crossing." Utah Code Ann. § 41-6-95(a)(4) (1982) (emphasis added).

process would still take 8.6 seconds, resulting inevitably in a collision with an unseen 50 mph train up to 636′ away when the process began, as discussed above.

Gleave's crossing design expert, Mitchell, stated it was possible to stop a car beyond the stop sign and have a clear view northward 440′ up the track, providing approximately 6 seconds to cross the tracks before a train farther away than that could reach the crossing. But in this position, "very close" to the track, a passing train would just miss the front end of the stopped car because the train engine is nearly 5′ wider than the track.

Van Wagoner testified that a driver who stopped with the front of his car 4′ from the track and then proceeded—upon seeing no oncoming train—would still take approximately 7 seconds to react, decide, and move across safely, making a collision inevitable if a 50 mph train was out of sight but fewer than 518′ away when the process began.

Rio Grande's accident reconstruction expert, Limpert, testified that it was physically possible to stop a car at a safe point only 7′ from the rail, but he did not testify to the length of the sight distance northward from that point. In his testimony, Limpert forcefully challenged the validity of the assumptions and factors used in Van Wagoner's calculations, e.g., the maximum speed possible given the track's condition and the inclusion of decision and reaction time in the computations. Limpert also provided his expert opinion, illustrated by a videotape of a car being driven over the crossing from a standstill and from various distances away, that the times necessary to cross safely were roughly one-third of the estimates given by Van Wagoner. However, it was for the jury to give these conflicting opinions whatever weight it deemed appropriate. *Groen v. Tri–O–Inc.*, 667 P.2d 598, 603 (Utah 1983).

We decline to hold that, as a matter of law, all reasonable persons would conclude Gleave's duty at this dangerous crossing was to inch his car forward past the established stop sign to stop a second time in this narrow and precarious zone which af-

forded no greater degree of safety when a train approaching at 50 mph was close but still out of view. *Cf. Seybold v. Union Pac. R.R. Co.*, 121 Utah 61, 70–71, 239 P.2d 174, 179 (1951) (plaintiff either failed to look, looked but failed to see what was there, or looked and failed to see the oncoming train because blinded by lights but proceeded anyway); *Drummond v. Union Pac. R.R. Co.*, 111 Utah 289, 177 P.2d 903, 906 (1947) (plaintiff would have had clear view of 25–30 mph train if she had stopped in a place "which afforded her both safety and an opportunity to look").

There is substantial evidence on which a jury could reasonably base a finding that Gleave exercised reasonable care under the circumstances and yet failed to see the oncoming train until it was too late to avoid the collision. Accordingly, we affirm the trial court's denial of Rio Grande's motion for a new trial.

### III. SOVEREIGN IMMUNITY

Gleave alleged in his complaint that UDOT breached its statutory duty under Utah Code Ann. §§ 54–4–14 through 15.1 (1986) to install, maintain and improve safety signals and devices at the 1600 South railroad crossing in Springville. Although there was a yellow warning sign, a crossbuck, and a stop sign at this crossing, he claimed that UDOT knew or should have known of the unreasonably dangerous condition there and that it negligently failed to install "adequate" safety signals or devices.

The trial court granted UDOT's motion to dismiss the complaint based on sovereign immunity. In so ruling, the court stated that "the decision of whether or not to install a safety signal at a particular crossing is a discretionary one protected by the Governmental Immunity Act," impliedly holding that the allegedly negligent actions of UDOT constituted a governmental function protected by the grant of immunity in Utah Code Ann. § 63–30–3 (1986).

On appeal, Rio Grande makes two arguments challenging this ruling: (1) UDOT's regulation of traffic warning devices at

railroad crossings is not a "governmental function" within the purview of section 63–30–3 and, therefore, UDOT is not immune from suit; and (2) the trial court erroneously concluded that UDOT's failure to install different safety devices at the subject crossing fell within the "discretionary function" exception to the waiver of immunity in Utah Code Ann. § 63–30–10(1) (1986).[6]

### A. GOVERNMENTAL FUNCTION

■ The Utah Governmental Immunity Act ("Act") states that, "[e]xcept as may be otherwise provided in this chapter, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function...." Utah Code Ann. § 63–30–3 (1986). In *Standiford v. Salt Lake City Corp.*, 605 P.2d 1230 (Utah 1980), the Utah Supreme Court abandoned the "governmental versus proprietary function" analysis previously used in deciding whether an entity was immune from suit for injuries resulting from a particular activity. In doing so, the court recognized that the Act does not expressly or impliedly set up such a dichotomy and that the results of the application of this analysis had been inconsistent and unpredictable. *See id.* at 1232–35. The court articulated a new test and redefined a governmental function as an activity "of such a unique nature that it can only be performed by a governmental agency or that it is essential to the core of governmental activity." *Id.* at 1237. Under the new test, the *Standiford* court concluded

the operation of a public golf course is not a governmental function. *Id.*

The next year, in *Johnson v. Salt Lake City Corp.*, 629 P.2d 432, 434 (Utah 1981), the court explained: "The first part of the *Standiford* test—activity of such a unique nature that it can only be performed by a governmental agency—does not refer to what government *may* do, but to what government alone *must* do."

The Utah Supreme Court has applied the *Standiford* test numerous times, concluding that the maintenance of traffic control devices,[7] supervision of financial institutions,[8] the issuance of motor vehicle titles and ownership recordkeeping responsibilities,[9] and supervision of subdivision development and canal fence construction[10] are governmental functions within the meaning of the Act. Supervision of disbursement of escrowed funds,[11] the provision of winter recreational areas on a public golf course,[12] and the operation of a sewage system[13] have been held not to be governmental functions.

UDOT is statutorily empowered to "provide for the installing, maintaining, reconstructing, and improving of automatic and other safety appliances, signals or devices at grade crossings," Utah Code Ann. § 54–4–15.1 (1986), and to apportion costs of such projects among public and private entities. Utah Code Ann. § 54–4–15.3 (1986). The government alone must consistently regulate safety devices at railroad crossings, determine which devices at which crossings should be recommended

---

6. In his cross-appeal, Gleave did not challenge the trial court's dismissal of UDOT. Rio Grande, in both its opposition to UDOT's pretrial motion to dismiss and in its appeal to this court, has not contended that Gleave's injury was caused by UDOT's creation of a dangerous condition on a road, for which immunity is expressly waived in Utah Code Ann. § 63–30–8 (1986). This separate waiver provision is not subject to the "discretionary function" exception in section 63–30–10(1). *Sanford v. University of Utah*, 26 Utah 2d 285, 488 P.2d 741, 745 (1971). *See Richards v. Leavitt*, 716 P.2d 276, 278 (Utah 1985) (per curiam); *Bigelow v. Ingersoll*, 618 P.2d 50, 54 n. 3 (Utah 1980).

7. *Richards v. Leavitt*, 716 P.2d 276 (Utah 1985) (per curiam).

8. *Madsen v. Borthick*, 658 P.2d 627 (Utah 1983).

9. *Metropolitan Fin. Co. v. State*, 714 P.2d 293 (Utah 1986) (per curiam).

10. *Loveland v. Orem City Corp.*, 746 P.2d 763 (Utah 1987).

11. *Cox v. Utah Mortg. & Loan Co.*, 716 P.2d 783 (Utah 1986).

12. *Johnson v. Salt Lake City Corp.*, 629 P.2d 432 (Utah 1981).

13. *Dalton v. Salt Lake Sub. San. Dist.*, 676 P.2d 399 (Utah 1984); *Thomas v. Clearfield City*, 642 P.2d 737 (Utah 1982).

for federal funding, rank crossings in order of need for upgrading in light of limited funds for that purpose, and apportion signal installation costs between public and private entities. As a practical matter, the private sector cannot perform these functions. Accordingly, we hold that the regulation of public safety needs and the evaluation, installation, maintenance and improvement of safety signals or devices at railroad crossings is a governmental function immunized from suit under section 63–30–3 of the Act.

## B. DISCRETIONARY FUNCTION EXCEPTION

In light of this holding, we must next determine whether UDOT's allegedly negligent failure to install different safety signals at the 1600 South crossing in Springville is a "discretionary function" within the meaning of Utah Code Ann. § 63–30–10(1)(a), an exception to the waiver of immunity in that statutory section:

(1) Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment except if the injury:

(a) arises out of the exercise or performance or the failure to exercise or perform a discretionary function, whether or not the discretion is abused[.]

The Utah Supreme Court has stated that this "discretionary function" exception was "intended to shield those governmental acts and decisions impacting on large numbers of people in a myriad of unforeseeable ways from individual and class legal actions, the continual threat of which would make public administration all but impossible." *Frank v. State*, 613 P.2d 517, 520 (Utah 1980). The *Frank* court noted its prior observation, in *Carroll v. State Road Comm'n*, 27 Utah 2d 384, 388, 496 P.2d 888, 891 (1972), that virtually all acts require the exercise of some degree of discretion and that the statutory exception should thus be confined to those decisions and acts occurring at the "basic policy-making level," and not extended to those acts

and decisions taking place at the operational level, or, in other words, "those which concern routine, everyday matters, not requiring evaluation of broad policy factors."

*Frank,* 613 P.2d at 520.

More recently, in *Little v. Utah State Div. of Family Servs.*, 667 P.2d 49 (Utah 1983), the court adopted the following test for distinguishing between functions at the policy-making level from those at the operational level, requiring affirmative answers to four preliminary questions in order for an act to be purely discretionary:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective?

(2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective?

(3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved?

(4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Id.* at 51.

With regard to the case before us, the first question presented by *Little* must be answered affirmatively. The basic governmental objective involved in "installing, maintaining, reconstructing, and improving" safety devices is the consistent promotion of public safety, a basic government objective. Evaluating all of the approximately 1,280 railroad crossings in the state and assigning priorities for safety signal upgrades is essential to the realization of the protection of public safety, especially in light of the fact that there are not unlimited funds available to upgrade all needy crossings at once. Thus, the second question of the *Little* test must also be answered affirmatively.

UDOT exercises "basic policy evaluation, judgment, and expertise" when evaluating railroad crossings for safety signal improvements and when deciding which crossings should have upgraded safety appliances first. In applying UDOT's safety policy, UDOT's surveillance team performs on-site inspections and weighs the numerous factors relating to crossing safety. The team consists of transportation experts who exercise their collective judgment and expertise in making their evaluations of the relative dangerousness of railroad crossings in Utah, taking into consideration their physical characteristics and configurations, the volume and type of vehicular and train traffic, and other relevant factors. Thus, the third *Little* question must be answered affirmatively.

Finally, Utah Code Ann. § 54–4–14 *et seq.* (1986) empowers UDOT with the authority to supervise and regulate the safety of all the State's railroad crossings, including the authority to provide for the installing, maintaining, reconstructing, and improving of safety devices and signals there. Utah Code Ann. § 54–4–15.1 (1986). UDOT clearly has the legal authority to use the monies available for safety signal improvement at the most dangerous crossings first, which means that other less dangerous crossings, such as this one, must await their turn for improvement. Thus, the answer to the fourth *Little* question is affirmative.

We therefore hold that UDOT's failure to install different safety signals or devices at the subject crossing was a purely discretionary function within the meaning of section 63–30–10(1)(a).

Prior Utah case law supports this conclusion. In *Velasquez v. Union Pac. R.R. Co.*, 24 Utah 2d 217, 469 P.2d 5 (1970), the Utah Supreme Court held that the Utah Public Service Commission's alleged failure to require better warning devices at a railroad crossing involved the exercise of a discretionary function for which immunity was not waived. The *Velasquez* plaintiff, a passenger in a pickup truck hit by a train, claimed that the state agency was liable for failing to require additional safety devices

at the crossing. Affirming summary judgment in the agency's favor, the court concluded that the statutory directive to the PSC to prescribe the installation of "appropriate" safety or other devices by the railroad company (under a prior version of section 54–4–14) indicated a legislative intent to confer discretion on the responsible agency at the time, i.e., the Public Service Commission:

> The statute gives the respondent [PSC] the power to require a different safety device at the crossing in question, but that does not mean that the plaintiff should recover simply because a better warning signal could or should have been installed. The Public Service Commission has the discretion to require the installation of such signals as in its judgment the health or safety of employees, passengers, customers or the public may require.

*Id.* at 218, 469 P.2d at 6.

We find no merit in Rio Grande's argument that *Velasquez* has been overruled by *Standiford* and *Bigelow v. Ingersoll,* 618 P.2d 50 (Utah 1980). As previously noted, *Standiford* overruled only those cases applying the "governmental versus proprietary function" analysis in deciding whether or not section 63–30–3 immunity applied to the allegedly injurious activity in the first place. In *Velasquez,* the court did not apply the later discredited mode of analysis; instead, it merely assumed there was a governmental function and focused solely on the applicability of the discretionary function exception. Similarly, in *Bigelow,* the court applied the "basic policy-making level versus operational level" distinction set forth in *Frank,* discussed above, and concluded that the design of the street traffic control system did not involve decisions and acts at the basic policy-making level and, therefore, was not a discretionary function within section 63–30–10(1). *Bigelow,* 618 P.2d at 53.

However, as stated above, the allegedly negligent omission in this case does involve decisions and acts at the basic policy-making level. The trial court thus correctly concluded that UDOT's failure to install

different safety devices or signals at the 1600 South crossing in Springville comes within the discretionary function exception of section 63–30–10(1)(a). We therefore affirm the dismissal of the complaint against UDOT.

## IV. PUNITIVE DAMAGE CLAIM

Gleave alleged that Rio Grande had knowledge of dangerous conditions at the crossing and "willfully or recklessly failed to take any corrective steps." At the close of Gleave's evidence, Rio Grande moved for a directed verdict on Gleave's punitive damage claim because of insufficiency of the evidence. Rio Grande argued that there was not one scintilla of evidence of willful or malicious activity on its part. Gleave agreed there was no proof of actual malice, but argued there was sufficient evidence of reckless conduct for the jury to imply malice.

The trial court granted Rio Grande's motion and withdrew the punitive damage issue from the jury's consideration; however, it is not clear whether that ruling was based on inadequate evidence of actual malice or implied malice.

■ In reviewing the correctness of the trial court's grant of a directed verdict to Rio Grande on Gleave's punitive damage claim, we must view the evidence in the light most favorable to him, the party against whom the motion was made. *Kim v. Anderson*, 610 P.2d 1270, 1271 (Utah 1980). If there is no evidence to justify punitive damages, the issue was properly withheld from the jury. *Tripp v. Bagley*, 75 Utah 42, 282 P. 1026 (1929). If, however, reasonable inferences supporting judgment for the losing party could be drawn from the evidence presented at trial, the directed verdict cannot be sustained. *Little America Refining Co. v. Leyba*, 641 P.2d 112, 114 (Utah 1982); *Kim*, 610 P.2d at 1271. This is so even if reasonable

persons might reach different conclusions on the punitive damage issue after considering the evidence and the reasonable inferences therefrom. *See Little America Refining Co.*, 641 P.2d at 114.

■ Before punitive damages may be awarded, the plaintiff must prove conduct that is willful and malicious or that manifests a knowing and reckless indifference toward, and disregard of, the rights of others. *Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 337 (Utah 1985); *Synergetics v. Marathon Ranching Co.*, 701 P.2d 1106, 1112–13 (Utah 1985); *Biswell v. Duncan*, 742 P.2d 80, 84 (Utah App.1987).

■ In our review of Rio Grande's duty of care, we noted substantial evidence from which a jury could reasonably conclude that Rio Grande was negligent. But evidence of simple negligence alone does not support an award of punitive damages.

> Punitive damages should be awarded infrequently. Simple negligence will never suffice as a basis upon which such damages may be awarded. "[They] are not awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence."

*Behrens v. Raleigh Hills Hosp., Inc.*, 675 P.2d 1179, 1186 (Utah 1983) (quoting Restatement (Second) of Torts § 908 comment b (1979)).[14]

In *Behrens*, the Utah Supreme Court identified three elements of the type of conduct that will support an award of punitive damages against a defendant in a negligence action who acts "maliciously or in reckless disregard for the rights of others." Although actual intent to cause injury is not necessary,

> the defendant must either know or should know "that such conduct would, [1] in a high degree of probability, result

---

**14.** We note that the Restatement (Second) of Torts § 908 (1979) states:

(1) Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him for his outrageous conduct and to deter him and others like him from similar conduct in the future.

(2) Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others....

in substantial harm to another," *Danculovich v. Brown,* Wyo., 593 P.2d 187, 193 (1979), and [2] the conduct must be "highly unreasonable conduct, or an extreme departure from ordinary care, [3] in a situation where a high degree of danger is apparent." *Id.* at 191.

*Behrens,* 675 P.2d at 1186–87 (numbering added).

We now evaluate the evidence presented by Gleave in light of these three elements:

(1) High degree of probability. There was uncontroverted testimony that there had been no accidents at this crossing up to the time of UDOT's inspection and evaluation in 1974. After that time, Rio Grande installed stop signs as a temporary measure until UDOT upgraded the crossing with flashing red lights. Gleave's attorney claimed he would offer evidence at trial of "near misses" at the crossing, but none was produced. The locality was rural, and the road not heavily travelled. There is no evidence that Rio Grande knew or should have known of the facts discovered by Gleave's experts after this accident. In any event, the evidence shows a low degree of probability.

(2) Highly unreasonable conduct or extreme departure from ordinary care. At worst, the evidence shows errors of judgment, i.e., ordinary negligence on the part of Rio Grande, in failing to take steps to reduce the risks at this crossing. There is no evidence of an extreme departure from ordinary care.

(3) High degree of danger apparent. A degree of danger exists at every railroad crossing. The evidence showed the degree of danger at this crossing was high. The crossing was more than ordinarily hazardous. But, was the extent of that danger readily apparent prior to this accident? Perhaps reasonable minds could differ concerning this prong of the *Behrens* test, but the first two prongs remain unsatisfied.

Moreover, the general rule is that only compensatory damages are appropriate and that punitive damages may be awarded *only in exceptional cases. Behrens,* 675 P.2d at 1186. The evidence shows nothing exceptional about Rio Grande's conduct in this case.

Furthermore, punitive damages should be awarded only when they will clearly accomplish a public objective not accomplished by the award of compensatory damages.... The intended deterrent effect must be clear and in proportion to the nature of the wrong and the possibility of recurrence.

*Id.* at 1187. Gleave has not directed our attention to any public objective which would clearly be accomplished by an award of punitive damages herein. Where the wrong is the result of simple negligence, there is nothing to deter. We believe the substantial compensatory award will provide ample motivation for Rio Grande to take appropriate measures to protect the public and itself from a recurrence of this unfortunate accident.

There is no evidence of malice, actual or implied, that would justify an award of punitive damages against Rio Grande. The trial court thus properly withheld that issue from the jury.

## V. PREJUDGMENT INTEREST

In the special verdict returned in this case, the jury awarded Gleave the following itemized damages:

| | | |
|---|---|---|
| A. | Past medical expenses | $56,000 |
| B. | Future medical expenses | $22,540 |
| C. | Past lost wages | $20,000 |
| D. | Loss of future earnings and earning capacity | $275,000 |
| E. | General Damages | $50,000 |
| F. | Market value of Gleave vehicle | $1,600 |
| | Total | $425,140 |

The trial court granted Gleave's post-trial motion to amend his complaint to include a claim for prejudgment interest on items A, C, and D, under Utah Code Ann. § 78–27–44 (1987). Gleave's request for prejudgment interest on items A and C was granted, but the court denied prejudgment interest on item D.

It is true, as Gleave asserts, that lost future earning capacity is a special damage insofar as pleading requirements are concerned. *Cohn v. J.C. Penney Co.,* 537 P.2d 306, 308 (Utah 1975). But we must still decide whether section 78–27–44 authorizes prejudgment interest on all types of special

damages, whether they arise before or after entry of a plaintiff's personal injury judgment.

In construing this legislation, we must give effect to the legislature's underlying intent, *American Coal Co. v. Sandstrom*, 689 P.2d 1, 3 (Utah 1984), and assume that each term in the statute was used advisedly. *West Jordan v. Morrison*, 656 P.2d 445, 446 (Utah 1982). We will interpret and apply the statute according to its literal wording unless it is unreasonably confused or inoperable. *Id.; Horne v. Horne*, 737 P.2d 244, 247 (Utah App.1987). A proper construction of its terms must further the statute's purposes. *RDG Assocs./Jorman Corp. v. Industrial Comm'n*, 741 P.2d 948, 951 (Utah 1987).

The statute provides:

> In all actions brought to recover damages for personal injuries sustained by any person, resulting from or occasioned by the tort of any other person, corporation, association or partnership, whether by negligence or willful intent of that other person, corporation, association or partnership, and whether that injury shall have resulted fatally or otherwise, it shall be lawful for the plaintiff in the complaint to claim interest on the special damages *alleged from the date of the occurrence of the act giving rise to the cause of action* and it shall be the duty of the court, in entering judgment for plaintiff in that action, to add to the amount of damages assessed by the verdict of the jury ... interest on that amount calculated at 8% per annum from the date of the occurrence of the act giving rise to the cause of action to the date of entering the judgment, and to include it in that judgment.

Utah Code Ann. § 78–27–44 (1987) (emphasis added). We agree with Rio Grande that this emphasized phrase clearly modifies "special damages," limiting those special damages on which prejudgment interest is recoverable to those that arise in the period between the act giving rise to the cause of action and entry of judgment in plaintiff's favor.

This interpretation of the statute furthers its purpose, as documented in its legislative history. When first introduced at the 1975 Legislature by Senator Renstrom as Senate Bill 153 and later passed by the Senate, the word "special" was not in the proposed statute; prejudgment interest was to be awarded a successful plaintiff on all "damages alleged from the date of the occurrence of the act...." *Utah Senate Tr. of 3rd Reading of S.B. 153*, February 20, 1975.

At the bill's second and third reading in the House of Representatives, however, there was a lengthy discussion of the problems with such a broad prejudgment interest provision. *Utah House of Reps. Tr. of 2nd and 3rd Reading of S.B. 153*, March 13, 1975. Some legislators voiced their concerns about accrual of interest on damages in a malpractice action where the cause of action did not even accrue until discovery of the injury, possibly many years after the date the injurious act occurred. A similar concern was voiced regarding injured minors who waited until after reaching majority age before bringing their lawsuits; under the proposed statute, interest could accrue for many years. Others feared the effect such a law would have on doctors' malpractice insurance rates and on all casualty insurance premiums in the state.

Toward the end of the House debate, Representative Fisher offered an amendment to add the word "special" before the word "damages" in the bill, explaining that special damages are the expenses paid for those who are injured so they can immediately receive necessary medical and hospital care. He added that special damages are

> those expenses that they have paid out of pocket, for which they have used their own money and which they will not get until the settlement of their action. Getting interest *on their out-of-pocket expenses will provide a total recoupment of any expenses that they have had from the time of the accident until they are paid in full by a recovery at court* or by settlement. I believe it's a reasonable and a very logical amendment that

interest on special damages be endorsed by us, and in that form we will pass the intent of the bill of paying for *all expenses until such time as judgment is rendered,* and we will not be assessing an interest on something that neither of the parties know.

*Id.* (emphasis added). In its amended form, Senate Bill 153 then passed in the House by five votes. When the amended bill was returned to the Senate later the same day, Senator Renstrom made a motion that the Senate concur in the House amendment. After that motion passed, the amended bill passed the Senate with no further discussion. *Utah Senate Tr. of Vote on S.B. 153,* March 13, 1975.

The legislative history and the statutory language reveal the legislature's intent to distinguish between special damages accruing between the date of the injurious act and the entry of judgment (such as medical expenses or lost wages) and those (such as lost future earnings and future earning capacity) that will arise subsequent to en-

try of judgment, and to authorize prejudgment interest only on the former category of special damages.[15] The trial court thus properly denied Gleave prejudgment interest under section 78–27–44 on that portion of damages in the special jury verdict designated as "lost future earnings and earning capacity."

## CONCLUSION

We have considered the other issues raised by Rio Grande and find them meritless. The judgment of the trial court is affirmed. Costs are awarded only to UDOT.

GARFF and BENCH, JJ., concur.

---

**15.** The latter type is, of course, subject to the statutory interest rate on judgments in Utah Code Ann. § 15–1–4 (1986).