2002 UT 17

PIGS GUN CLUB, INC., aka Pigs, Inc., Pigs Gun Club, L.L.C. aka Pigs, Inc., Bryce H. Roberts, Lynn Clayson, Robert Cordner, Paul Carnesecca, Frank Carnesecca, and Richard Bona, Plaintiffs and Appellants,

v.

SANPETE COUNTY, Sanpete County Road Department, Consolidated Sevier Bridge Company, Utah Department of Transportation, Department of Soil Conservation, Central Utah Water Conservancy District, State of Utah, State Engineers Office, Department of Natural Resources, Division of Water Rights, Sevier River Water Commission (Upper), State Park Service, Board of Water Resources, Deseret Irrigation Company, Utah Water Company, Milville Irrigation Company, Delta Canal Company, Abraham Irrigation Company, and John Does I through X, Defendants and Appellee.

No. 990213.

Supreme Court of Utah.

Feb. 1, 2002.

J. David Nelson, Robert D. Dahle, Sandy, and Jere Reneer, Spanish Fork, for plaintiffs.

David Nuffer, Brent M. Brindley, St. George, for Sanpete County.

HOWE, Chief Justice.

## INTRODUCTION

¶ 1 This case involves a dispute over damage to real property owned by plaintiffs Pigs Gun Club, Inc. (PGC) and Bryce Roberts.[1] Plaintiffs appeal from the trial court's order granting defendant Sanpete County's (the County) motion for summary judgment and dismissing all of plaintiffs' claims. They contend that genuine issues of material fact should have prevented summary judgment.

---

1. Although there were other persons named as plaintiffs, we refer only to PGC and Mr. Roberts because we affirm the trial court's dismissal of the other plaintiffs for failing to file a written notice of claim with Sanpete County.

## BACKGROUND [2]

¶ 2 Plaintiffs are owners of real property in Sanpete County that adjoins the Sevier River and lies south of the Yuba Reservoir. The Sevier River flows north into the reservoir and is bisected by the Fayette River Lane (the Lane), a public road that lies between plaintiffs' property and the reservoir. The Lane, which has existed for many years, runs nearly perpendicular to the river; it crosses the river over a culvert bridge and provides access to the east and west sides of the river.

¶ 3 Before 1983, the Lane was low enough that when the river's waters rose too high to pass under the culvert bridge, the overflow water could flow north over the Lane toward the reservoir. However, in about 1983, runoff waters were high enough to wash out parts of the bridge culvert and the Lane. The County constructed a new bridge culvert and repaired the Lane. The repaired Lane was built higher than before the washout, and the County progressively built it up even higher through maintenance and repair from 1983 through 1995. In 1995, the river's water level was again higher than normal, and water accumulated on the south side of the Lane, flooding plaintiffs' property. Plaintiffs allege that the flooding was caused by the increased height of the Lane, which instead of allowing excess water to flow over it toward the reservoir as it had done before 1983, impeded the waters and caused them to back up onto and damage plaintiffs' property.

¶ 4 At some point during the flooding in 1995, plaintiffs met with the County to request that the Lane be breached to allow the excess waters to flow through to the reservoir. The County's representatives assessed the situation and decided not to breach the Lane. A short time later, the flood waters breached the lane and the water that had backed up onto plaintiffs' property receded. However, the County repaired the breach, after which water again backed up onto and further damaged plaintiffs' property.

¶ 5 Plaintiffs brought this action, asserting claims against the County [3] for negligence and strict liability in failing to properly maintain the Lane. They also asserted that in failing to maintain the Lane properly and thus allowing the flooding that damaged plaintiffs' property, the County committed a partial or complete taking of their property.

¶ 6 The County moved for summary judgment on these claims, asserting, inter alia, that plaintiffs' claims were barred under the Utah Governmental Immunity Act, Utah Code Ann. §§ 63–30–1 to –38 (1997) (the Act). The trial court granted the County's motion, making what it termed findings of undisputed fact and the following conclusions of law:

> The County's decisions with regard to the management of the flood water during the spring 1995 runoff were the exercise of a discretionary function.
>
> Further, the County's actions or inaction were for the management of flood waters and were related to the operation of flood or storm system.
>
> Further, the flooding of the real property to which Plaintiffs claim title was the result of a latent dangerous or defective condition of a road, culvert and bridge.
>
> Therefore, for all the foregoing reasons, Plaintiffs' negligence claim against the County is barred by operation of the Act.

Additionally, the trial court dismissed several of the named plaintiffs from the suit because they had failed to file a notice of claim, and it dismissed plaintiffs' strict liability claim pursuant to the Act. The trial court also dismissed with prejudice the inverse condemnation claim because "the flooding of Plaintiffs' property was not the intended or unavoidable consequence of the County's activities with regard to the lane." Plaintiffs appeal, asserting that the above legal conclusions are erroneous because disputed issues of material fact remain.

---

2. In reviewing a grant of summary judgment, we review the facts in a light most favorable to the non-moving party and recite them accordingly. *Tretheway v. Miracle Mortgage, Inc.,* 2000 UT 12, ¶ 2, 995 P.2d 599.

3. Though other defendants were named in the case, this appeal involves only the County.

## STANDARD OF REVIEW

¶ 7 A motion for summary judgment should be granted only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c); *Copper State Leasing v. Blacker Appliance*, 770 P.2d 88, 89 (Utah 1988). Accordingly, in reviewing a trial court's grant of summary judgment, " 'we consider only whether [it] correctly applied the law and correctly concluded that no disputed issues of material fact existed.' " *Surety Underwriters v. E & C Trucking*, 2000 UT 71, ¶ 14, 10 P.3d 338 (quoting *Aurora Credit Servs., Inc. v. Liberty W. Dev., Inc.*, 970 P.2d 1273, 1277 (Utah 1998)). In so doing, we view all facts and reasonable inferences drawn therefrom in a light most favorable to the nonmoving party. *Tretheway v. Miracle Mortgage, Inc.*, 2000 UT 12, ¶ 2, 995 P.2d 599.

## ANALYSIS

### I. UTAH GOVERNMENTAL IMMUNITY ACT

¶ 8 The trial court dismissed the following claims pursuant to the Act: all claims of those plaintiffs who had failed to file a notice of claim, all claims based on strict liability, and all negligence claims. We review first whether the Act does indeed bar those claims; then we review the dismissal of the inverse condemnation claim.

#### A. Notice of Claim

¶ 9 To begin, we affirm the trial court's dismissal of the claims of plaintiffs Lynn Clayson, Robert Cordner, Paul Carnesecca, Frank Carnesecca, and Richard Bona. Section 63–30–11 of the Act requires any person making a claim against a government entity or one of its employees to file with that entity a written notice of claim before that person can maintain an action. Section 63–30–13 requires that the notice be filed "within one year after the claim arises, or before the expiration of any extension of time granted." Utah Code Ann. § 63–30–13 (1997).

¶ 10 The only notice of claim timely filed in this case listed only PGC and Mr. Roberts as claimants. Plaintiffs argue that this notice was sufficient for all plaintiffs because "[t]here is no case law ... [that] asserts that the [A]ct requires a specific name to be on the notice of claim when all the governmental entities involved know who the plaintiffs are." However, we note that the statute itself clearly requires *any person* filing suit against a government agency to file a notice of claim. *Id.* § 63–30–11(2). In other words, each plaintiff's name must be on the notice of claim. Although the purpose of a notice of claim is to "provide[ ] the governmental entity an opportunity to correct the condition that caused the injury, evaluate the claim, and perhaps settle the matter without the expense of litigation," *Larson v. Park City Mun. Corp.*, 955 P.2d 343, 345–46 (Utah 1998), as plaintiffs themselves note, we have consistently held that those purposes are fulfilled only by the timely filing of a notice of claim-even when the entity charged had actual notice of the circumstances of the claim. *See Longley v. Leucadia Fin. Corp.*, 2000 UT 69, ¶ 21, 9 P.3d 762 (" 'We have consistently required strict compliance with the requirements of the Immunity Act. Actual notice does not cure a party's failure to meet these requirements.' " (quoting *Rushton v. Salt Lake County.*, 1999 UT 36, ¶ 19, 977 P.2d 1201)). Because the notice of claim filed in this case included only the claims of PGC and Mr. Roberts, we hold that it was insufficient to support the action in behalf of Lynn Clayson, Robert Cordner, Paul Carnesecca, Frank Carnesecca, and Richard Bona. The claims of these plaintiffs were therefore properly dismissed.

#### B. Strict Liability and Negligence

¶ 11 In Utah, government entities are immune from suit for injury resulting from the exercise of governmental functions unless that immunity has been waived by statute. To determine whether immunity has been waived for the particular activity for which a plaintiff is filing a claim, we must answer three questions: (1) whether the activity is a governmental function, for which the legislature has granted blanket immunity

in section 63–30–3;[4] (2) if the activity is an immunized governmental function, whether that blanket immunity has been waived in another section of the Act; and (3) if immunity has been waived, whether the Act contains an exception to that waiver that would result in the retention of the immunity despite the waiver. *See Keegan v. State*, 896 P.2d 618, 619–20 (Utah 1995) (citing *Ledfors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1164 (Utah 1993)).

¶ 12 The injuries for which the County is being sued arise out of activities that have been characterized by the parties as (1) the negligent management of flood waters, or (2) the dangerous, unsafe, or defective design, construction, maintenance, or repair of a public highway, reservoir, dam, dike or levee. The parties do not dispute that all of the above activities are governmental functions and thus fall under the general grant of immunity in section 63–30–3.

¶ 13 The next prong of the test is answered in the affirmative: immunity for the above activities has been waived by statute. Immunity for the maintenance of the Lane, whether under the theories of negligence or

strict liability,[5] is waived by sections 63–30–8 [6] and –9.[7] Subject to numerous exceptions, immunity for the negligent acts of the County (i.e., negligent management of flood waters) is waived by section 63–30–10.[8]

¶ 14 However, under the next prong of the test, we look to see whether immunity is then retained under any section of the Act. Specifically, activities for which immunity is waived in sections 63–30–8, –9 and –10 are subject to the exceptions set forth in the subsections of section 63–30–10.[9] Thus, if the County's actions giving rise to plaintiffs' negligence claims can be characterized as *either* the management of flood waters or storm systems, *or* a discretionary function *or* a latent defect in a road or other improvement, plaintiffs' claims are barred by those exceptions.

¶ 15 The trial court found that the County's activities arose out of the management of flood waters and the construction, repair and operation of the flood or storm systems in the Sevier River channel and therefore held that immunity for the negligence of the County was retained by section 63–30–10(13) and (14). It also determined that plaintiffs' highway claim arose out of "a latent danger-

---

4.  This section provides in relevant part: "Except as may be otherwise provided in this chapter, all governmental entities are immune from suit for any injury which results from the exercise of a governmental function...." Utah Code Ann. § 63–30–3 (1997).

5.  The trial court erred in stating that plaintiffs did not show any basis for waiver of liability for their strict liability claims. As plaintiffs argue, sections 63–30–8 and –9 waive immunity for injury caused by dangerous or defective conditions of certain improvements. The text of these sections does not limit these waivers to claims based on a negligence theory. Thus the sections also waive immunity for claims based on strict liability.

6.  This section provides:

   Unless the injury arises out of one or more of the exceptions to waiver set forth in Section 63–30–10, immunity from suit of all governmental entities is waived for any injury caused by a defective, unsafe, or dangerous condition of any highway, road, street, alley, crosswalk, sidewalk, culvert, tunnel, bridge, viaduct, or other structure located on them.
   Utah Code Ann. § 63–30–8 (1997).

7.  This section provides:

   Unless the injury arises out of one or more of the exceptions to waiver set forth in Section 63–30–10, immunity from suit of all governmental entities is waived for any injury caused from a dangerous or defective condition of any public building, structure, dam, reservoir, or other public improvement.
   Utah Code Ann. § 63–30–9 (1997).

8.  This section provides in pertinent part: "Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment except if the injury arises out of, in connection with, or results from...." Utah Code Ann. § 63–30–10 (1997).

9.  In *Sanford v. University of Utah*, 26 Utah 2d 285, 488 P.2d 741, 745 (1971), we held that section 63–30–10 only recaptured claims arising under sections 63–10–8 and 63–10–9 sounding in negligence. However, in 1991, the legislature amended both sections 63–10–8 and 63–10–9 by adding to the beginning of those sections the following words: "Unless the injury arises out of one or more of the exceptions to waiver set forth in section 63–30–10," immunity from suit of all government entities is waived. Thus the exceptions listed in 63–30–10 apply to all of the causes of action pleaded by the plaintiff, whether sounding in negligence or strict liability.

ous or defective condition of a road, culvert and bridge" and was therefore barred. Utah Code Ann. § 63–30–10(16) (1997).

¶ 16 However, whether an activity can be characterized as the management of flood waters, the construction, repair, and operation of a flood or storm system, or as the creation of a latent dangerous or defective condition for purposes of subsections 16 or 17 is a question of fact—and in this case a question of material fact because it determines whether plaintiffs' negligence claims are barred by the exceptions. We thus review whether the trial court appropriately determined that these material facts were not in dispute.

¶ 17 Plaintiffs allege that they were injured by the County's action on three separate occasions. The first act was designing and rebuilding the Lane too high after the 1983 floods, causing the runoff waters to back onto plaintiffs' land in 1995 (pre 1995 activity). The second act alleged is the failure to breach the Lane after the 1995 flooding occurred (refusal to breach). The third act alleged is filling in the breach, which caused the water to back up on the property again (refill of breach). The County's actions on each of these occasions must be tested for immunity purposes. For purposes of summary judgment, to retain immunity under one of the exceptions contained in section 63–30–10, there can be no genuine issues of material fact about whether the County's acts on each of these occasions constituted the activities described in either subsection 1 of section 63–30–10 (discretionary function), subsection 13 (management of flood waters), subsection 14 (operation of flood or storm systems), subsection 16 (latent defect in highway) or subsection 17 (latent defect in public improvement). Thus we review whether the trial court correctly determined that no genuine dispute existed concerning these material facts.

## 1. Flood Waters and Storm System

¶ 18 The County's motion for summary judgment alleged that no material facts were in dispute regarding whether its actions were for the management of flood waters. In their opposition to the motion, plaintiffs submitted evidence to dispute the County's assertion for each activity (pre–1995 activity, refusal to breach, and refill of breach). We will review separately the evidence submitted for each activity.

### a. Pre–1995 Activity

¶ 19 To dispute that the pre–1995 activity was for the purpose of flood management, plaintiffs first submitted deposition testimony of Keller Christenson, a Sanpete County Commissioner, who was involved in making decisions regarding the reconstruction of the road. Christenson stated that the County, in response to advice from its road supervisor, "haul[ed] additional fill in ... to bring the road a little higher" only for the purpose of "firm[ing] up the road," which was built over a wetland area. When asked whether the raising of the road was in consideration of water management, Keller responded, "No. That wasn't a factor involved." And again, when asked whether the raised bridge (upon which the Lane is constructed) was intended to be used as a flood control measure, Keller responded "No. Absolutely not." This testimony is clearly sufficient to raise a dispute about whether the pre 1995 activity was for the purpose of flood management.

### b. Refusal to Breach

¶ 20 To dispute that the refusal to breach was a flood control measure, plaintiffs submitted deposition testimony of Commissioner Christenson, Stephen Keller, a county road supervisor, and Ross Blackam, the county attorney. Christenson testified that the decision not to breach was motivated by a desire to maintain access to properties on the west side of the river. In discussing the possibility of breaching the Lane with the road supervisor and the county attorney, Christenson stated:

> We discussed the height of the water. We discussed the possibility of breaching the road. And we weighed that against the desires of those other people that needed to use the road. They needed to move livestock across it in the next several days going to the mountain and so on their permitted areas.

In response to being asked whether the County decided not to breach the road be-

cause it was concerned about continuing the access to those people who have property on the west side of the road, Christenson responded, "Yes."

¶ 21 Keller, who was the road supervisor when the County refused to breach the road, affirmed that the reason the County decided not to breach the Lane "was that [Commissioner Christenson] didn't want to cut off access to the people on the west side of the river." Similarly, Blackham, Sanpete County Attorney, stated that in discussing with Commissioner Christenson whether to breach the road, "We talked about having claims filed against us by people west of the road who had been complaining to the Commissioner about the county cutting their access." Again, this testimony was sufficient to raise a dispute over whether the County refused to breach the Lane for purposes of flood control.

### c. Refilling the Breach

¶ 22 Again, plaintiffs submitted deposition testimony of Commissioner Christenson to dispute the fact that the decision to refill the breach was to control or manage flood waters. In response to counsel's question, "If I understand your testimony correctly, the reason that you decided not to leave this road in a breached condition was you wanted to provide access to the people on the west side of the river?" Christenson said, "Yes."

¶ 23 The trial court, though aware of this testimony, found that in deciding not to breach the road, "the county officials may have made statements that they did not believe that they were acting in a flood control capacity, [but] they were clearly doing so." The trial court also found that "[a]ll decisions made and measures taken by the County subsequent to the flooding were for the management of flood waters."

¶ 24 Based on the evidence presented by plaintiffs, we cannot affirm the trial court's conclusion that no disputes of material fact exist regarding whether the County was acting in a flood management capacity or operating a flood or storm system as is required to retain immunity under sections 63–30–

10(13) and (14). A trial court is not authorized to weigh facts in deciding a summary judgment motion, but is only to determine whether a dispute of material fact exists, *Draper City v. Estate of Bernardo*, 888 P.2d 1097, 1100 (Utah 1995) ("On a motion for summary judgment, a trial court should not weigh disputed evidence, and its sole inquiry should be whether material issues of fact exist."), viewing the facts and all reasonable inferences to be drawn therefrom in a light most favorable to the nonmoving party. *Tretheway v. Miracle Mortgage, Inc.*, 2000 UT 12, ¶ 2, 995 P.2d 599. The trial court did not follow this standard, and thus improperly concluded that no material issues of fact were disputed. We therefore reverse summary judgment on this issue and remand it to the trial court to determine whether the County was acting in a capacity outlined in section 63–30–10(13) or (14) sufficient to retain the grant of immunity for each of the three occasions charged.

### 2. Discretionary Function

¶ 25 The County's second ground for retaining immunity under section 63–30–10 is that if its activities giving rise to plaintiffs' cause of action are found to be the maintenance, construction, or repair of a highway or other improvement, those activities were in the exercise of a discretionary function, which is excepted from the waiver granted in sections 63–30–8 and –9. The trial court did not address this issue. Although in its conclusions of law it stated that "[t]he County's decisions *with regard to the management of the flood water* during the spring 1995 runoff were the exercise of a discretionary function" (emphasis added), the trial court did not determine whether the design, construction, repair, or maintenance of the Lane was a discretionary function. Therefore, we remand this issue to the trial court with instructions to apply the test for discretionary functions set out in *Keegan v. State*, 896 P.2d 618, 623 (Utah 1995).[10]

### 3. Latent Defects

¶ 26 Finally, the County contends it is immune from plaintiffs' claim because any

10. To distinguish between discretionary and nondiscretionary functions, we have looked at

"whether the decision in question involves the formulation of policy or the execution of already-

injuries they sustained were the result of a latent defect in the Lane. Section 63–30–10(16) and (17) retain immunity for injuries that arise out of, in connection with, or resulting from "a latent dangerous or latent defective condition of any highway, road, street, alley, crosswalk, sidewalk, culvert, tunnel, bridge, viaduct, or other structure located on them," and for " 'a latent dangerous or latent defective condition of any public building, structure, dam, reservoir, or other public improvement.' " We have defined a latent defect as " 'a defect which reasonably careful inspection will not reveal,' " *Ingram v. Salt Lake City*, 733 P.2d 126, 127 (Utah 1987) (quoting *Vincent v. Salt Lake County*, 583 P.2d 105, 107 (Utah 1978)), and we have stated that the existence of a latent defect is a question for the fact finder to answer. *See id.* ("[W]hat constitutes ... a latent defect of a water meter lid presents a question of fact that is properly answered by a jury."). There had been flooding in the area before 1995. Evidence in the record suggests that the pre 1995 activity may or may not have remedied the situation, and that the refusal to breach and the breach refill activities were made in the face of design defects. Taking the inferences from these facts in a light most favorable to plaintiffs, we conclude that summary judgment on this issue was erroneous. We therefore remand this issue to the trial court.

## II. INVERSE CONDEMNATION

¶ 27 The first two elements plaintiffs must show to establish an inverse condemnation claim, (1) a property interest (2) taken or damaged, *Farmers New World Life v. Bountiful City*, 803 P.2d 1241, 1244 (Utah 1990), are not disputed by the parties for purposes of summary judgment. The parties do dispute, however, whether plaintiffs have established the third element: that the property was taken or damaged for a *public use. Id.*

¶ 28 We held in *Farmers* that although an improvement may be in support of a particular public use, "damages [that] are not a direct and necessary consequence of the construction or operation of a public use are not recoverable in an inverse condemnation action." 803 P.2d at 1245. In other words, we have limited damages "to those injuries [that] are the direct and unavoidable consequence of the construction or use of the improvement." *Id.*

¶ 29 The trial court concluded that the property was not damaged or taken for a public use because "the flooding of Plaintiffs' property was not the intended or unavoidable consequence of the County's activities with regard to the lane." We reverse the trial court on this issue and remand it for further consideration for two reasons. First, although the trial court did not articulate it, we presume that it considered the so called "flood management" improvements to the road to be the "public use" that damaged plaintiffs' property. Because we have reversed and remanded the flood management issue, we must remand for a determination of whether the property was damaged or taken for public use.[11] Second, whether the dam-

---

formulated policies.... [T]he discretionary function exception 'should be confined to those decisions and acts occurring at the "basic policymaking level," and not extended to those acts and decisions taking place at the operational level ... "which concern routine, everyday matters, not requiring evaluation of broad policy factors." ' " *Keegan v. State*, 896 P.2d 618, 623 (Utah 1995) (citations omitted). Specifically, we have used the following four-part test to determine whether a specific act is discretionary: (1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program, or objective? (2) Is the questioned act, omission, or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision? *Id.* at 624 (quoting *Little v. Utah State Div. of Family Servs.*, 667 P.2d 49, 51 (Utah 1983)).

11. In other words, if the finder of fact concludes that the County was indeed acting in a flood control capacity, it will then have to determine whether the damage necessarily resulted from

age to plaintiffs' property interest *"necessarily* result[ed]"* from that public use, *Farmers*, 803 P.2d at 1245, is a question of fact disputed in this case. We remand this issue with instructions to the trial court to review this issue according to the standard we enunciated in *Farmers*.

### CONCLUSION

¶ 30 After reviewing the arguments and evidence on the record, we reverse the trial court's grant of summary judgment and remand the case to the trial court for further proceedings consistent with this opinion.

¶ 31 Associate Chief Justice RUSSON, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Chief Justice HOWE's opinion.

that public use. If the factfinder concludes that the County was not acting in a flood management or control capacity, it will have to determine whether the damage was indeed for a public use and then whether the damage necessarily resulted from that use. *See Farmers*, 803 P.2d 1241, 1244–46.