2002 UT 130

**James LOVENDAHL, Sue Lovendahl, Wesley Lovendahl, Plaintiffs and Appellants,**

v.

**JORDAN SCHOOL DISTRICT, Defendant and Appellee.**

**No. 20010274.**

Supreme Court of Utah.

Dec. 27, 2002.

Stephen G. Homer, Salt Lake City, for plaintiffs.

Blake T. Ostler, Salt Lake City, for defendant.

DURHAM, Chief Justice:

## INTRODUCTION

¶ 1 This case addresses two issues. The first concerns the scope of Utah's Governmental Immunity Act (the Act). Utah Code

Ann. § 63–30–1 to –36 (1997 Supp.2002). Section 63–30–10(18)(c) of the Act immunizes governmental entities from liability for injuries arising from "regulating, mitigating, or handling hazardous materials or hazardous wastes." Granting the defendant school district's motion for summary judgment, the trial court held as a matter of law the defendant school district immune from plaintiff's nuisance suit under section 63–30–10(18)(c) when defendant attached a vent pipe to a sewer line on its property and propelled sewer gas onto plaintiff's adjacent property, causing plaintiff's alleged injuries. The trial court reasoned that the school district was disposing of hazardous waste within the meaning of section 63–30–10(18)(c) of the Act.

¶ 2 Although the court unanimously reverses the trial court's decision on this issue, we are divided on the rationale supporting this result. Justice Howe and I agree that because the school district has no statutory authority to dispose of hazardous waste, it is not entitled to the protections of section 63–30–10(18)(c) of the Utah Governmental Immunity Act. Associate Chief Justice Durrant, joined by Justice Russon and Justice Wilkins, concludes that section 63–30–10(18)(c) allows the school district to retain immunity, but that the provision does not apply in this case because the school district has not proven that the sewer gas at issue is, as a matter of law, a hazardous waste within the meaning of section 63–30–10(18)(c). As such, Associate Chief Justice Durrant's concurring and dissenting opinion constitutes the majority view on this issue.

¶ 3 On the second issue, the plaintiffs claim that the installation of the vent pipe so interfered with the use and enjoyment of their property that they are entitled to damages for inverse condemnation. The trial court held that no inverse condemnation occurred because the actual value of the plaintiffs property did not decline. We uphold the ruling of the trial court on this issue.

## BACKGROUND

¶ 4 Defendant Jordan School District (the school district or the District) is a duly organized school district and a political subdivision of the State of Utah. The District owns and operates Riverton Elementary School ("Riverton Elementary" or the "school"), located in Riverton, Utah. The plaintiffs, James Lovendahl, Sue Lovendahl, and their son Wesley Lovendahl (the "Lovendahls"), own and occupy a single family home on a parcel of property immediately adjacent to Riverton Elementary School.

¶ 5 Riverton Elementary was constructed by the school district and first opened during the 1995–96 school year. Not long after the school was opened, students and district employees began to complain about persistent, offensive odors in the school. To determine the origin and composition of the odors, the District engaged in repeated testing of the air in Riverton Elementary. The tests disclosed the presence of hydrogen sulfide in the school. Hydrogen sulfide has the chemical composition $H_2S$, and is often described as smelling like rotten eggs.

¶ 6 The District determined that the presence of hydrogen sulfide (and accompanying rotten egg smell) in the school was the result of a back-up of naturally-occurring gas in the school's sewage system.[1] To resolve this problem the District installed a vent pipe equipped with a mechanical blower to the sewer drain line leading away from the school. The purpose of the vent pipe was to draw the offending sewer gas out of the sewer line and pump the gas into the air, away from the school building. The sewer vent pipe consisted of a vertical pipe about twenty feet high and ten inches in diameter. A mechanical blower was attached to the top of the vent pipe to facilitate drawing the gas out of the school's sewer lateral and to aid in discharging the gas (and odor) into the air. The length of time that the District operated the vent pipe and blower is unclear from the record and appears to be in dispute based

1. At oral argument, counsel for the District suggested that the precise cause for the back-up of sewer gas was a problem associated with the "grease trap" maintained as part of the school's cafeteria facilities. This fact is not discussed in the briefs submitted for this appeal, nor in the opinion of the trial court.

upon the parties' representations at oral argument.

¶ 7 The vent pipe was installed close to the outer boundary of the school grounds. However, the Lovendahls claim that the sewer vent pipe was located only a few feet away from their property line, and just seventeen feet from their single-family home. Following installation of the vent pipe, the Lovendahls began complaining to the District about offensive odors emanating from the vent pipe. Sue Lovendahl claims that the emissions from the vent pipe either caused or aggravated an ongoing asthmatic condition. The other plaintiffs, James and Wesley Lovendahl, do not claim any personal injuries resulting from the actions of the District. However, the Lovendahls claim that the sewer vent pipe has unreasonably interfered with the use of their property.

¶ 8 Dissatisfied with the response to their complaints, the Lovendahls filed suit against the District on December 12, 1997. The Lovendahl's suit initially included several causes of action against the District, including: (1) common law nuisance, (2) criminal nuisance, (3) public nuisance, (4) negligent infliction of emotional distress, (5) intentional infliction of emotional distress, and (6) inverse condemnation. The Lovendahls also sought an award of punitive damages.

¶ 9 The District moved to dismiss the Lovendahls' claims for negligent and intentional infliction of emotional distress, criminal nuisance, and punitive damages. The Lovendahls did not oppose this motion, and these claims were dismissed on March 3, 1998. On March 13, 1998, the District answered the complaint, and on that same day, the Lovendahls petitioned the court for a preliminary injunction requiring the District to cease operation of the vent and seal it off. Observing that the District had sealed the pipe just before the preliminary injunction hearing, the court denied the motion.

¶ 10 On September 13, 2000, the District filed a motion for summary judgment on the Lovendahls' remaining three claims: common law nuisance, public nuisance, and inverse condemnation. The District argued in its summary judgment motion that it was immune from liability for these claims under section 63–30–10(18)(c) of the Utah Governmental Immunity Act. Utah Code Ann. § 63–30–10(18)(c) (1997). Section 63–30–10(18)(c) immunizes government entities from liability for injuries arising from the "activities of . . . regulating, mitigating, or handling hazardous materials or hazardous wastes." The District argued that the sewer gas being vented contained hydrogen sulfide, that hydrogen sulfide is a hazardous waste under Utah law, and that the District is thus immune from suit under section 63–30–10(18)(c) for any injuries resulting from efforts to dispose of such hazardous wastes. The District argued further that the Lovendahls' inverse condemnation claim must fail because the value of their property had actually increased, rather than declined, since the initial installation of the sewer vent pipe.

¶ 11 The Lovendahls opposed the District's motion on the grounds that the District was not authorized by the State to engage in the disposal of hazardous wastes, and therefore the District should not be entitled to claim the protections of section 63–30–10(18)(c). They also argued that the District should be held liable under section 63–30–9 of the Utah Code, which waives immunity from suit for all governmental entities for injuries resulting from, *inter alia*, a "dangerous or defective condition of any public building, structure . . . or other public improvement." Utah Code Ann. § 63–30–9 (1998). The Lovendahls further disputed whether hydrogen sulfide was a hazardous waste or hazardous material under Utah law. On the inverse condemnation claim, the Lovendahls did not dispute that the value of their property had increased since the vent pipe was installed. Rather, they simply argued that the District had "condemned," "taken," and "damaged" their property when it installed the sewer vent pipe.

¶ 12 On the nuisance issue, the trial court agreed with the District's analysis and granted its motion for summary judgment based on the retention of immunity for injuries arising from the disposal of hazardous waste under section 63–30–10(18)(c). On the inverse condemnation claim, the trial court also granted the District's summary judgment motion, relying on the fact that the value of

the Lovendahls' property had not declined since the sewer vent pipe was installed. The Lovendahls appealed the grant of summary judgment on both issues. We reverse the trial court on the nuisance claim and affirm the trial court's ruling on the inverse condemnation claim.

## STANDARD OF REVIEW

¶ 13 A motion for summary judgment should be granted only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Utah R. Civ. P. 56(c); *Pigs Gun Club v. Sanpete County,* 2002 UT 17, ¶ 7, 42 P.3d 379, 382. When reviewing a grant of summary judgment, we review the trial court's conclusions of law for correctness. *Laney v. Fairview City,* 2002 UT 79, ¶ 9, 57 P.3d 1007. As such, "we consider only whether [the trial court] correctly applied the law and correctly concluded that no disputed issues of material fact existed." *Pigs Gun Club,* 2002 UT 17 at ¶ 7, 42 P.3d 379, (citations omitted). We view all facts and reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *Id.*

## ANALYSIS

### I. GOVERNMENTAL IMMUNITY

A. *The School District's Immunity from Liability Under Section 63-30-10(18)(c) of the Utah Governmental Immunity Act*

¶ 14 Section 63-30-10 of the Utah Governmental Immunity Act contains nineteen specific exceptions to the various waiver of immunity provisions found elsewhere in the Act. Utah Code Ann. § 63-30-10. This case requires the court to examine for the first time section 63-30-10(18)(c) of the Act. Section 63-30-10(18)(c) retains the state's immunity from liability for injuries arising from

the "regulat[ion], mitigat[ion], or handling [of] hazardous materials or hazardous wastes" by governmental entities. The District claims that it is immune from liability for any injury caused to the Lovendahls because it was "mitigating" a "hazardous waste" problem within the meaning of section 63-30-10(18)(c) when it installed the vent pipe and propelled the sewer gas into the air near the Lovendahls' property.

¶ 15 In *Ledfors v. Emery County Sch. Dist.,* 849 P.2d 1162 (Utah 1993), we clarified that determining whether a governmental entity is immune from suit under the Act requires the court to answer three questions:

(1) Was the activity the entity performed a governmental function and therefore immunized from suit by the general grant of immunity contained in section 63-30-3 of the Utah Code?

(2) If the activity undertaken was a governmental function, has some other section of the Act waived that blanket immunity?

(3) If the blanket immunity has been waived, does the Act also contain an exception to that waiver which results in a retention of immunity against the particular claim asserted in this case?

*Id.* at 1164.[2]

¶ 16 We answer the first *Ledfors* question in the affirmative. The activity of the District in venting the sewer gas was a governmental function subject to the general immunity provision of section 63-30-3 of the Act. Under section 63-30-3, "all governmental entities are immune from suit for any injury which results from the exercise of a governmental function." Utah Code Ann. § 63-30-3(1). Under the Act, "governmental function" includes "any act, failure to act, operation, function, or undertaking of a governmental entity." Utah Code Ann. § 63-30-2(4)(a). A "governmental entity" is defined

---

**2.** In the briefs submitted to the court for this appeal, neither party directly addresses the three-part test for governmental immunity identified in *Ledfors,* despite its presence in our recent decisions addressing the scope of Utah's governmental immunity statute. *See, e.g., Laney v. Fairview City,* 2002 UT 79, ¶ 11, 57 P.3d 1007; *Lyon v. Burton,* 2000 UT 19, ¶ 13, 5 P.3d 616, 620; *Taylor ex rel. Taylor v. Ogden City Sch. Dist.,* 927

P.2d 159, 162 (Utah 1996); *Keegan v. State,* 896 P.2d 618, 619-620 (Utah 1995). We undertake the *Ledfors* analysis here for consistency with these decisions. Furthermore, we believe that the third prong of the *Ledfors* test properly frames the dispositive issue in this case: whether the claimed exception to the waiver of immunity applies to the particular claim now before the court. *Ledfors,* 849 P.2d at 1164.

as "the state and its political subdivisions." Utah Code Ann. § 63–30–2(3). The term "political subdivision" is further defined to include a school district. Utah Code Ann. § 63–30–2(7). For the purposes of *Ledfors* analysis, the general grant of immunity in section 63–30–3, which applies broadly to all governmental entities, includes the school district's venting of the sewer line.

¶ 17 We also answer the second *Ledfors* question in the affirmative. That is, we believe that another section of the Governmental Immunity Act has waived the blanket immunity for governmental functions found in section 63–30–3. Specifically, the Lovendahls argue that section 63–30–9 of the Act waives immunity for the District's activities. That section reads:

Unless the injury arises out of one or more of the exceptions to waiver set forth in Section 63–30–10, immunity from suit of all governmental entities is waived for any injury caused from a dangerous or defective condition of any public building, structure, dam, reservoir, or other public improvement.

Utah Code Ann. § 63–30–9 (1997). The District concedes that it built and operated the vent pipe on its property. Moreover, the District does not dispute that the emissions from the vent pipe were dangerous, or that the Lovendahls were injured by the operation of the vent pipe. Indeed, the District does not actually dispute the applicability of section 63–30–9[3] at all, but argues instead that the waivers of immunity in section 63–30–9 are subject to the exceptions contained in section 63–30–10,[4] which includes the hazardous waste exception.

¶ 18 Having answered the first two of the three *Ledfors* questions in the affirmative, we now address the third: "[i]f the blanket immunity has been waived, does the Act also contain an exception to that waiver which results in a retention of immunity against the particular claim asserted in this case?" *Ledfors*, 849 P.2d at 1164. The District argues that section 63–30–10(18)(c) provides such an exception. Justice Howe and I disagree.

### B. Analysis of Applicability and Legislative History of Section 63–30–10(18)(c)

¶ 19 Section 63–30–10(18)(c) retains immunity for governmental entities that cause injury while "regulating, mitigating, or handling hazardous materials or hazardous wastes." The District claims that the sewer vent pipe emissions contained hydrogen sulfide, an arguably hazardous waste under Utah law, and the District should be immune from any injuries arising from the disposal of hydrogen sulfide under section 63–30–10(18)(c). However, the District does not examine the legislative purpose behind section 63–30–10(18)(c) to support the application of that exception here. Rather, the District simply argues that the exceptions contained in section 63–30–10 apply to all "governmental entities," and because the District is a governmental entity, the hazardous materials exception must apply.

1. Principles of Statutory Construction Applied to Section 63–30–10(18)(c).

¶ 20 The court has long held that "[w]hen interpreting statutes, our primary goal is to evince the 'true intent and purpose of the Legislature.' " *State v. Tooele County*, 2002 UT 8, ¶ 10, 44 P.3d 680 (citing *Jensen v. Intermountain Health Care, Inc.*, 679 P.2d 903, 906 (Utah 1984)). Ascertaining the true intent and purpose of the legislature in enacting section 63–30–10(18)(c) is particularly important in this case. Adherence to the District's interpretation of section 63–30–10(18)(c) would effectively authorize *all* governmental entities in Utah, regardless of their mission or purpose, to dispose of hazardous materials and hazardous wastes and

---

3. The court has previously held that section 63–30–9 applies to state-operated sewer facilities. In *Parrish v. Layton City Corp.*, 542 P.2d 1086, 1088–89 (Utah 1975), the court held that immunity from liability for damages caused by the State's operation of a defective sewer drain and canal was waived under section 63–30–9.

4. In 1991, the legislature amended both sections 63–30–8, and –9 by adding to the beginning of those provisions: "Unless the injury arises out of one or more of the exceptions to waiver set forth in section 63–30–10, immunity from suit of all government entities is waived." Utah Code Ann. § 63–30–8, –9 (1997).

then claim immunity from any resulting liability.

¶ 21 " 'When interpreting statutes, we determine the statute's meaning by first looking to the statute's plain language, and give effect to the plain language unless the language is ambiguous.' " *Wilson Supply, Inc. v. Fradan Mfg. Corp.*, 2002 UT 94, ¶ 14, 54 P.3d 1177 (quoting *Blackner v. State Dep't of Transp.*, 2002 UT 44, ¶ 12, 48 P.3d 949); *State Dep't of Natural Res. Div. of Wildlife Res. v. Huntington–Cleveland Irrigation Co.*, 2002 UT 75, ¶ 13, 52 P.3d 1257. Where the language of a statute is ambiguous, we may look to the statutory scheme to divine legislative intent. *State v. Burns*, 2000 UT 56, ¶ 25, 4 P.3d 795 (holding that "we need look beyond the plain language only if we find some ambiguity").

¶ 22 Justice Howe and I believe that the meaning of section 63–30–10(18)(c) is ambiguous because this subsection does not specifically mention the state agencies to which it applies. The preamble to section 63–30–10 states that "[i]mmunity from suit of all governmental entities is waived ... except if the injury arises out of, in connection with, or results from" any of the nineteen governmental activities specifically listed. Utah Code Ann. § 63–30–10 (1997). Justice Howe and I do not believe, however, that when the legislature carved out exceptions to the waiver of immunity that it intended *all* governmental entities to retain immunity for *all* of the activities listed therein. No doubt some of the exceptions in 63–30–10 do apply across the board and a plain language reading of the statute is reasonable as applied to such general exceptions as the exercise of discretionary functions,[5] or harms arising from intentional torts.[6] Such exceptions apply on their face to virtually every state agency, regardless of its specific mission.

¶ 23 The logical consequence of Associate Chief Justice Durrant's plain language reading of section 63–30–10, however, is to permit any "governmental entity" to escape liability for the conduct of its employees, should an employee negligently act beyond his/her statutory authority in breaking up riots and public demonstrations,[7] managing earthquakes and natural disasters,[8] fighting fire,[9] or intervening in dam emergencies.[10]

¶ 24 We believe that such a construction of the statute is unreasonable and requires us to look beyond the plain language of the statute for guidance. "[I]n construing a statute, [we] must assume that 'each term in the statute was used advisedly; thus the statutory words are read literally, unless such a reading is unreasonably confused or inoperable.' " *County Bd. of Equalization of Wasatch County v. State Tax Comm'n*, 944 P.2d 370, 373 (Utah 1997) (quoting *Savage Indus., Inc. v. State Tax Comm'n*, 811 P.2d 664, 670 (Utah 1991)). Our principal goal must be to give effect to the intent of the legislature. As such, we turn to the legislative history of section 63–30–10(18)(c) to determine what the legislature intended to accomplish when it enacted this provision.

2. Legislative History of Section 63–30–10(18)(c)

¶ 25 The legislative history of section 63–30–10(18)(c) and this court's previous decisions interpreting the Governmental Immunity Act provide insight into the intent and purpose behind the hazardous materials exception.

¶ 26 In 1985, the Utah Legislature passed Senate Bill 58, adding a hazardous materials exception to the waiver of immunity provisions contained in the Governmental Immunity Act. 1985 Utah Laws ch. 169 § 1. Senate Bill 58 amended section 63–30–10 to retain immunity for injuries that "arise[ ] out of the activities of providing emergency medical assistance, fighting fire, handling hazardous materials, or emergency evacuations." *Id.*

¶ 27 When the Utah Legislature added the hazardous materials exception to section 63–

---

5.  § 63–30–10(1).

6.  § 63–30–10(2).

7.  § 63–30–10(7).

8.  § 63–30–10(13).

9.  § 63–30–10(18)(b).

10.  § 63–30–10(18)(e).

30–10 in 1985, the purpose was to protect *firefighters* from liability arising from the handling of hazardous materials in emergency situations. *See* Floor Debate, 46th Utah Leg., Gen. Sess. (Jan. 28, 1985) (Senate Audiograph Disc no. 28) (statement of Sen. Haven J. Barlow) (hereinafter "Barlow Statement"). Indeed, the title of the bill was "An Act ... Amending the Governmental Immunity Act to Extend Immunity to Fire Fighters Engaged in Providing Emergency Medical Services and Removing Hazardous Materials." S.B. No. 58, 46th Utah Leg., 1985. According to the bill's sponsor, Senator Barlow, the purpose of the bill was to ensure that firefighters were immune from liability when facing new hazards "such as handling hazardous materials and emergency evacuations." *See* Barlow Statement; 1985 Utah Laws ch. 169, § 1.

¶ 28 Nothing in the legislative materials from 1985 suggests that the legislature contemplated that the new immunity for handling hazardous materials would be applied to any state activity other than firefighting. Accordingly, the legislative intent behind the 1985 law does not provide support for the District's application of the hazardous material exception to the Lovendahls' nuisance suit.

¶ 29 In 1989, the legislature amended the hazardous materials exception in section 63–30–10, giving the provision its current form. 1989 Utah Laws ch. 268, § 28; Utah Code Ann. § 63–30–10(18)(c) (1997). The 1989 amendments extended the 1985 language to include immunity for injuries arising from "regulating, mitigating, or handling hazardous materials or hazardous wastes." 1989 Utah Laws ch. 268, § 28.

¶ 30 The 1989 changes to section 63–30–10(18)(c) were also not intended to immunize the District's actions in this case. The 1989 amendments were part of the Underground Storage Tank Act ("USTA"), a law creating a state administered underground storage tank fund. 1989 Utah Laws ch. 268, § 28; Utah Code Ann. §§ 19–6–401, et seq. (1998).

Aimed at dealing with the problem of "leaking underground storage tanks," the USTA created a means of compensating persons injured by releases from underground storage tanks containing hazardous materials (such as petroleum). *See* Floor Debate, 48th Utah Leg., Gen. Sess. (Feb. 16, 1989) (Senate Audiograph Disc no. 80) (statement of Sen. Finlinson). The statute "establishes regulations with which [underground storage tank] owners and operators must comply to participate in the fund." Wendy M. Lewis, *Recent Developments in Utah Law, Legislative Enactments,* 1990 Utah L.Rev. 236, 243.

¶ 31 The legislative history of the USTA does not specifically address the amendments to section 63–30–10(18)(c). Nevertheless, the purpose behind the amendment to section 63–30–10(18)(c) is clear in light of the mandates of the USTA. In the event of a release from a petroleum storage tank, the USTA authorizes the Solid and Hazardous Waste Control Board to undertake a number of remedial actions, including "investigative, abatement, or corrective action," among others.[11] Utah Code Ann. § 19–6–420(2)(b)(i) (1998). Given that purpose, the expansion of section 63–30–10(18)(c) to provide immunity for injuries arising from "regulating, mitigating, or handling hazardous materials or hazardous wastes" was logical. After all, the USTA authorizes the State to administer and conduct clean-up efforts following accidental releases of hazardous materials from underground storage tanks. The amendments to section 63–30–10(18)(c) simply ensure that the State will incur no liability when the Hazardous Waste Control Board authorizes or conducts such efforts.

¶ 32 Again, there is nothing in the legislative history of the 1989 amendments to section 63–30–10(18)(c) to suggest that the legislature intended to apply this specific immunity to any state agencies other than those with statutory responsibility for protecting the public from the harms of hazardous materials.

---

11. The USTA authorizes the Solid and Hazardous Waste Control Board to "provide monies from the fund for abatement action," (§ 19–6–420(3)(a)), requires the board to review corrective and abatement plans (§ 19–6–420(4)), and develop and implement its own corrective abatement measures (§ 19–6–420(8)(a),(b)). Utah Code Ann. §§ 19–6–420 to -(8) (1998).

¶ 33 The narrow view Justice Howe and I take today of the applicability of the hazardous waste exception is consistent with previous decisions of this court interpreting other waiver exceptions in the Governmental Immunity Act. The District's immunity claim is highly analogous to previously unsuccessful arguments of other school districts that have acted beyond their limited area of responsibility and then invoked a waiver exception to immunize them from liability. We have previously held, that specific exceptions to the waiver provisions in the Governmental Immunity Act apply only to state agencies responsible for providing public services that specifically relate to those exceptions.

¶ 34 In *Williams v. Carbon County Bd. of Ed.*, 780 P.2d 816, 817 (Utah 1989), a school district resurfaced an elementary school parking lot in a manner that caused surface waters to drain onto the property of a neighboring landowner, flooding and damaging his home. The school district had built a diversion curb on the border of the parking lot to retain surface waters—but this measure failed. *Id.* The property owner brought suit for damages and the school district claimed "absolute immunity" from suit under the flood waters management provision in section 63–30–3 of the Governmental Immunity Act. *Id.* at 817–18; Utah Code Ann. § 63–30–3 (1997). That section allows the state to retain immunity for the "management of flood waters" and the "construction, repair, and operation of flood and storm systems by [a] governmental entity." Utah Code Ann. § 63–30–3(3). The school district claimed that the installation of the diversion curb brought it under this provision. We rejected this argument, observing that the school district was engaged in resurfacing a parking lot, not in managing flood waters, for which "the school district ha[d] no such statutory responsibility." *Id.* at 818. (quoting *Branam v. Provo Sch. Dist.*, 780 P.2d 810, 811 (Utah 1989)). We held that in enacting section 63–30–3, the legislature did not intend to immunize the school district from liability for its negligence. *Id.* Rather, we noted that "like private property owners, owners of public property must exercise reasonable care in controlling surface water runoff." *Id.*

¶ 35 The holding in *Williams* was supported by *Branam v. Provo School District*, 780 P.2d 810, (Utah 1989), a companion case to *Williams*. The plaintiff in *Branam*, the owner of a home next to an elementary school, filed an action for damages against a school district for its allegedly negligent conduct. *Id.* at 810. The plaintiff claimed that the school's efforts to remove flood waters from its basement—by pumping the water onto a grassy field abutting her property—had caused her own basement to flood. *Id.* at 810. In defense, the school district claimed that it was immune from suit for any injuries caused by its actions, again under the flood waters provision of section 63–30–3 of the Governmental Immunity Act. This court agreed with the plaintiff that the school district could not claim immunity under section 63–30–3 because the school district was acting beyond the scope of the statute. *Id.* at 812. We held that section 63–30–3 applies only to state agencies that are actually responsible for protecting the public from flood waters, whereas "the school was simply pumping water out of its basement like any other property owner seeking to avoid damage to its property from percolating water." *Id.* at 812.

¶ 36 Our analysis of the legislative purpose behind section 63–30–3 in both *Branam* and *Williams* applies directly to the conclusions Justice Howe and I draw about the applicability of section 63–30–10(18)(c) today. It is worth quoting the dispositive portions of *Branam* at length to demonstrate the similarity in reasoning:

> [W]e cannot accept the district's argument that in removing water from its basement, the school was engaged as a governmental entity in the "management of flood waters" so as to confer immunity upon it. Nothing in the language of either section 63–30–3 or any other part of ... the comprehensive flood waters management bill that added [the flood waters provision] indicates that the legislature intended to entirely immunize any entity entitled to the label "governmental" from anything it might do in any capacity with what could be termed "flood waters."

In the present case, the district certainly does not fall within the intendment of the statute. It was not charged with the responsibility to deal with flood waters or to construct flood or storm systems, and the school did not act to protect the public at large from flood waters. Its actions were indistinguishable from those any other landowner might have taken to protect its property. As such, it enjoys no immunity from Branam's suit.

*Id.* at 812–13. Similarly, Justice Howe and I cannot accept the argument that the District was engaged as a governmental entity in the act of mitigating or handling hazardous materials or wastes under section 63–30–10(18)(c) when it vented sewer gas out of the sewer line and pumped it onto the property of an adjoining landowner. Justice Howe and I conclude that the District was merely acting as a private landowner abating the presence of offensive odors caused by a defective sewer line. It was not acting as a governmental entity engaged in the authorized disposal of hazardous waste. The District was concerned with protecting only the interests of students and district employees, not with protecting the public at large from the risks associated with handling hazardous wastes.[12] Since its actions were indistinguishable from those of a private landowner, it is subject to the Lovendahls' suit for nuisance. *See Sanford v. Univ. of Utah,* 26 Utah 2d 285, 488 P.2d 741, 745 (1971) (holding that waiver of immunity in section 63–30–10(9) permits cause of action for private nuisance based on dangerous or defective public improvement).

¶ 37 The District's attempts to distinguish *Williams* and *Branam* are not persuasive. The District suggests these cases are distinguishable because they involve flood waters and the "Court relied heavily on the legislative history and the well-known events which prompted the inclusion of this provision in the governmental immunity act." However, both of those cases and the one before us similarly involve governmental entities claiming immunity for acts done in areas beyond their fields of expertise and statutory responsibility. Moreover, it is left unexplained why reliance upon legislative history and "well known events" distinguishes these cases. Justice Howe and I rely here on the legislative history of section 63–30–10(18)(c), just as we did in *Branam* and *Williams.* That events preceding those cases (the one-hundred-year-flood of 1983) were "well-known" is irrelevant.

¶ 38 The District further argues that it would be "unreasonable" to apply the requirement that government entities have some statutory responsibility authorizing them to act in the area for which they claim immunity before applying one of the exceptions listed in section 63–30–10. Justice Howe and I do not believe this requirement is unreasonable. In fact, it is only in unusual cases, such as the one at bar, where it will be unclear whether a governmental entity has statutory authority to act in an area to which the exceptions apply. Many of the exceptions apply on their face only to specifically named governmental entities.

¶ 39 Furthermore, in the hard cases, imposing a requirement of statutory responsibility makes for sound public policy. This is because section 63–30–10 includes several waiver of immunity exceptions for governmental functions needed to protect the public from harm.[13] Utah Code Ann. § 63–30–10(1–19)(1997). Requiring that the governmental entity invoking an exception listed in section 63–30–10 actually have some statutory responsibility to act ensures that in a time of public need *only* those agencies with the training and qualifications required to protect the interests of the public from a particular harm will assume such obligations. Governmental entities that act outside the scope of their statutory responsibilities in their own interests—which is not necessarily

12. The District concedes in its brief that it located the sewer vent pipe away from the school in order to protect school children.

13. Under section 63–30–10, the State retains immunity for, *inter alia,* injuries arising from riots, unlawful assemblies, public demonstrations, mob violence, and civil disturbance (§ 63–30–10(7)), the failure to make an inspection or making a negligent inspection (§ 63–30–10(4)), the incarceration of persons in prisons and jails (§ 63–30–10(10)), management of flood waters, earthquakes or natural disasters (§ 63–30–10(13)), and intervening during dam emergencies (§ 63–30–10(18)(e)).

the public interest—should continue to risk legal liability for their conduct.

¶ 40 The District is asking this court to sanction, if not invite, the worst abuses of governmental immunity. Under the District's view, any governmental entity would be authorized to dispose of hazardous waste and claim immunity for any harm arising therefrom. For that matter, the District would have the court apply all of the exceptions listed in section 63–30–10 to *all* state agencies, without inquiring whether the agency has any mandate to act in those areas. This is not what the legislature intended.

*C. Utah Administrative Code Regulations Do Not Authorize School District's Actions*

¶ 41 Justice Howe and I are also unpersuaded by the District's argument that it has the requisite statutory responsibility required to apply section 63–30–10(18)(c) or that it was "legally required to take the actions the Lovendahls complain of." The District refers the court to Rule R392–200 of the Utah Administrative Code, addressing the "Design, Construction, Operation, and Safety of Schools." Rule R392–200–6 of that section directs that

> [r]ooms shall be provided with natural or mechanical ventilation that admits fresh air and is sufficient to remove or prevent the accumulation of obnoxious odors, smoke, dust and fumes.

Utah Admin. Code R392–200–6(B)(1)(a) (2000). This section further states that "[i]n new or extensively remodeled establishments, all rooms from which obnoxious odors, vapors or fumes originate shall be mechanically vented to the outside of the building." Utah Admin. Code R392–200–6(B)(2)(b) (1994).

¶ 42 The District argues that it acted pursuant to this authority when it vented the sewer gas outside of Riverton Elementary and onto the Lovendahl's property. Justice Howe and I do not doubt that the District has a responsibility to comply with these regulations. However, we do not believe that the District's conduct is sheltered from liability for harm to third parties under these rules. Furthermore, Justice Howe and I doubt seriously that these regulations require, in any sense, that the District resolve its sewer problem by propelling sewer gas toward a neighboring landowner.

¶ 43 First, the District has not acted within the language of the regulations. Rule R392–200–6(B)(1)(a) requires that *"rooms"* shall be provided with natural or mechanical ventilation to prevent the accumulation of obnoxious substances in the air. But the District has not ventilated a single "room," it has ventilated a sewer line at the outer boundary of school property. Second, the sewer vent pipe installed by the District addresses a problem much different than the one contemplated in the regulations. Rule R392–200–6(B)(2)(b) requires that "all *rooms* from which obnoxious odors, vapors or fumes *originate* shall be mechanically vented to the outside of the building." (Emphasis added). The District has not acted to ventilate rooms in which obnoxious odors "originate"—which may include places like shop classes, chemistry laboratories, and locker rooms, among others. In fact, the obnoxious odors being ventilated do not "originate" in a school room at all, but (as the District concedes) in the sewer line running beneath the school.

¶ 44 Third, the District has not shown any nexus between the administrative regulations it cites and the hazardous waste exception in section 63–30–10(18)(c). The District cites no authority to support any connection between the fresh air regulations and the disposal of hazardous materials under section 63–30–10(18)(c).

¶ 45 Finally, even if we believed that the District was disposing of hazardous waste, rather than just solving a problem with its sewer line, the immunity claim would still fail because the District has not demonstrated compliance with the applicable hazardous waste disposal laws. The District is subject to Utah Administrative Code Rule R392–200(5)(J)(1), requiring that any school engaged in the disposal of hazardous wastes "shall comply with the Utah hazardous waste management rules and applicable local regulations." Utah Admin. Code R392–200(5)(J)(1) (2000). The District argues only

that it "does not believe that it has in fact violated any such regulations." Convinced that section 63–30–10(18)(c) completely immunizes it from liability for the Lovendahls' injuries, the District makes no attempt to show that its conduct complies with any state or local hazardous waste regulations.

¶ 46 However, the Utah hazardous waste management rules explicitly waive immunity for the kind of reckless conduct the District has engaged in here. Section 19–6–321(2) of the Utah Hazardous Waste Act states:

> In addition to the governmental immunity granted in Title 63, Chapter 30, Utah Governmental Immunity Act, the state and its political subdivisions are not liable for actions performed under this part *except as a result of intentional misconduct or gross negligence including reckless, willful, or wanton misconduct.*

Utah Code Ann. § 19–6–321(2) (1998) (emphasis added). In accord with section 19–6–321(2), Justice Howe and I believe that a governmental entity arguing as its core legal theory that it has knowingly exposed a neighboring landowner to an unmitigated hazardous substance has engaged in misconduct sufficient as a matter of law to preclude the application of section 63–30–10(18)(c).

¶ 47 Section 63–30–10(18)(c) immunizes from liability state agencies authorized to protect the public at large from dangers associated with handling or disposing of hazardous materials or hazardous wastes. When a governmental entity acts in its own interest, without authority or regard for the public interest, the protections of the Governmental Immunity Act do not bar liability. Therefore Justice Howe and I would conclude that the trial court was in error in granting summary judgment on the Lovendahls' nuisance claims, and would reverse that decision. Because we believe a primary matter that the District cannot invoke section 63–30–10(18)(c) since it does not have statu-

tory responsibility for handling, mitigating, or disposing of hazardous wastes, we do not reach the question of whether hydrogen sulfide is a hazardous material or a hazardous waste under Utah law.

## II. LOVENDAHLS' CLAIM FOR INVERSE CONDEMNATION

¶ 48 The Lovendahls also claim that the installation of the vent pipe so interfered with the use and enjoyment of their property that they are entitled to damages for inverse condemnation. The trial court granted the District's motion for summary judgment on this issue, holding there was no inverse condemnation because the actual value of the plaintiffs property did not decline, but increased. We agree with the trial court's ruling on this issue.

¶ 49 Under Utah law, an action for inverse condemnation requires: (1) property, (2) a taking or damaging, and (3) a public use. *Farmers New World Life Ins. Co. v. Bountiful City,* 803 P.2d 1241, 1243–44 (Utah 1990). The Lovendahls argue that the act of pumping "hazardous waste" into the air next to their home amounted to a taking or damaging of their property for the benefit of the District.[14] On appeal, the Lovendahls refer to pre-trial affidavits and interrogatories to show that they lost the use and enjoyment of their property for a period of time and that their property value has declined. They claim their land was damaged from exposure to the sewer gas, the family home was filled with obnoxious odors, and that the Lovendahls themselves suffered injury (including Sue Lovendahl's asthma condition).

¶ 50 The District argues that the Lovendahls' inverse condemnation claim must fail because the Lovendahls never offered evidence of loss of use, of physical damage, or an actual diminution in value of their property. In its motion for summary judgment

---

14. The Lovendahls observe, and the District does not dispute, that the Utah Governmental Immunity Act waives immunity for inverse condemnation claims. Section 63–30–10.5(1) of the Act provides:

> (1) As provided by Article I, Section 22 of the Utah Constitution, immunity from suit of all governmental entities is waived for the recov-

ery of compensation from the governmental entity when the governmental entity has taken or damaged private property for public uses without just compensation.

Utah Code Ann. § 63–30–10.5(1). Since the District concedes that it would be liable in the event of an actual taking, we need not engage in the *Ledfors* immunity analysis.

before the trial court, and again on appeal, the District refers to Sue Lovendahl's deposition testimony that the value of the Lovendahls' property had not declined, but had actually increased, since the installation of the sewer pipe. In its opposition to the District's motion for summary judgment, the Lovendahls never discuss the District's argument based on this testimony. Under Rule 4–501(2)(B) of the Utah Rules of Judicial Administration, all facts set forth in the movant's statement of facts are "deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party's statement." Utah R. Judicial Admin. 4–501(2)(B)(2002). The Lovendahls are thus estopped from now arguing that there was insufficient evidence on this point.

■ ¶ 51 The District argues that any additional facts included in the Lovendahls' brief to show a taking or damaging of their property (including damage to their land, home, and other personal injuries) are not properly before this court. Indeed, none of the evidence of "damage" the Lovendahls discuss on appeal was ever put before the trial court at the summary judgment stage. That is, the Lovendahls never drew the trial court's attention to any specific record evidence showing damage to their land, home, or any injuries related to the inverse condemnation claim.[15] The only record evidence before the trial court was the Lovendahls' admission that the value of their property had actually increased since the time the sewer vent pipe was installed. This court will not consider evidence not made part of the record on appeal. See Robinson v. Tripco Inv., Inc., 2000 UT App 200, ¶ 2 n. 1, 21 P.3d 219 (granting motion to strike portions of appellate brief referring to deposition testimony not made part of record on appeal) (citing Russell v. Thomson Newspapers, Inc., 842 P.2d 896, 899 n. 3 (Utah 1992)) (stating that appellate court will "consider deposition material that was actually before the trial court").

15. Any omission from the record on appeal concerning the inverse condemnation issue should not be construed as detracting from the evidence properly before the trial court on the nuisance claim.

¶ 52 In spite of the evidence the Lovendahls would have us consider now, they failed to present sufficient evidence to the trial court at the summary judgment stage to create a triable issue of material fact on the inverse condemnation issue. The trial court was therefore correct in granting summary judgment on this claim.

## CONCLUSION

¶ 53 We reverse the decision of the trial court regarding the Lovendahls' nuisance claim, and affirm its grant of summary judgment on the inverse condemnation claim. The case is remanded to the trial court for a trial, or other proper disposition, of the Lovendahls' claim for relief based on nuisance.

¶ 54 Justice HOWE concurs in Chief Justice DURHAM's opinion.

DURRANT, Associate Chief Justice, concurring and dissenting:

¶ 55 I concur in the result but dissent from the reasoning of the lead opinion. While I agree with the lead opinion's position on the first two Ledfors[1] questions, in my view, the third Ledfors question should be answered differently.

¶ 56 The third Ledfors question requires the trial court to make the following inquiry to determine whether a governmental entity is immune from suit: "If the blanket immunity has been waived, does the Act also contain an exception to that waiver which results in a retention of immunity against the particular claim asserted in this case?" 849 P.2d at 1164. I believe that the plain language of section 63–30–10(18)(c) of the Utah Code allows Jordan School District ("the District") to retain immunity provided that the vented hydrogen sulfide qualified as hazardous material or hazardous waste. Because of disputed facts about the origin of the hydrogen sulfide vented from the District's sewer line, I cannot conclude as a matter of law that the hydrogen sulfide constituted hazardous mate-

1. Ledfors v. Emery County Sch. Dist., 849 P.2d 1162, 1164 (Utah 1993).

rial or hazardous waste, and, therefore, I would reverse.

## I. PLAIN LANGUAGE ANALYSIS

¶ 57 As the lead opinion notes, section 63–30–10(18)(c) retains immunity for governmental entities that cause injury while "regulating, mitigating, or handling hazardous materials or hazardous wastes." However, the lead opinion limits this retention of immunity to "state agencies responsible for providing public services that specifically relate to those exceptions." Thus, the lead opinion, in effect, amends the statute to read that immunity is retained for governmental entities that cause injury while "regulating, mitigating, or handling hazardous materials or hazardous wastes, *provided the agency is responsible for providing public services that specifically relate to those exceptions.*"

¶ 58 While this addition to the statutory language may well be good policy, it does not change the fact that such language is not in the statute. In order to justify this qualification to the language of the statute, the lead opinion contains an exhaustive review of the statute's legislative history. It is well established, however, that "[w]hen interpreting a statute, we look first to its plain language and go no further unless we find the language ambiguous." *Cook v. Zions First Nat'l Bank,* 2002 UT 105, ¶ 8, 57 P.3d 1084 (citation omitted). Here, the language of the statute is plain and needs no further explanation *because there is no ambiguity:*

> Immunity from suit of all governmental entities is waived for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment except if the injury arises out of, in connection with, or results from:
> . . . .
> (18) the activities of . . . (c) regulating, mitigating, or handling hazardous materials or hazardous wastes.

Utah Code Ann. § 63–30–10(18)(c) (Supp. 2002). The statute therefore grants immunity to *all* governmental entities if an injury arises out of a number of different activities, including "the activities of . . . regulating, mitigating, or handling hazardous materials or hazardous wastes." *Id.* If the legislature had intended to limit immunity to only those governmental entities that are "responsible for providing public services that specifically relate to those exceptions," it would not have used the word "all." Because the plain language of the statute provides immunity to all governmental entities when the injury arises out of any of the enumerated exceptions, there is no need to look any further. The lead opinion does so, however, and is thereby led to unnecessarily read additional terms into the statute.

¶ 59 The lead opinion relies on two cases to justify its conclusion that the specific exceptions to the waiver of immunity apply only to governmental agencies authorized to provide such services. In *Branam v. Provo School District,* 780 P.2d 810 (Utah 1989), and *Williams v. Carbon County Board of Education,* 780 P.2d 816 (Utah 1989), this court determined that governmental entities did not retain immunity under section 63–30–3 of the Utah Code because they were not engaged in the management of flood waters. Part of our analysis in those cases turned on whether the governmental entities involved had "statutory responsibility" to conduct the actions for which they claimed immunity. *Branam,* 780 P.2d at 812–13; *Williams,* 780 P.2d at 818. This court adopted the statutory responsibility analysis because it determined that the language of section 63–30–3, which had recently been enacted, resulted from the legislature's concern "about potential liability from police power measures taken to protect public and private property from natural disasters such as the heavy flooding that occurred in many locations in Utah in 1983." *Branam,* 780 P.2d at 812. However, I believe that the plain language of section 63–30–3 was unambiguous and the court should not have implied limiting language into that statute. Accordingly, I am unwilling to extend the logic of those cases to subsection 63–30–10(18)(c).[2]

---

2. In addition, *Branam* and *Williams* dealt with the language of a different statute. While those cases analyzed immunity under section 63–30–3, we must determine whether immunity is retained under section 63–30–10(18)(c), which applies, in

¶ 60 Thus, in my view, the District is entitled to retain immunity from suit if it is a governmental entity that caused an injury while regulating, mitigating, or handling hazardous materials or hazardous wastes. It is undisputed that the District is a governmental entity. Therefore, in order to determine whether immunity has been retained, I turn to the question of whether the vented hydrogen sulfide qualified as hazardous material or hazardous waste as a matter of law.

## II. HYDROGEN SULFIDE AS HAZARDOUS MATERIAL OR HAZARDOUS WASTE

¶ 61 Both hazardous material and hazardous waste are defined in the Utah Code. Using the Utah Code definition, the trial court determined that hydrogen sulfide was a "hazardous material" as a matter of law. The summary judgment would be sustainable, however, if the vented hydrogen sulfide was, as a matter of law, *either* a hazardous *material* or a hazardous *waste*.

### A. Utah's Statutory Definition of "Hazardous Material"

¶ 62 Section 19–6–302(7) of the Utah Code defines "hazardous materials" to be "hazardous waste as defined in the Utah Hazardous Waste Management Regulations, PCBs, dioxin, asbestos, or a substance regulated under 42 U.S.C., Section 6991(2)." Utah Code Ann. § 19–6–302(7) (1998). The trial court and the parties focused their efforts on determining whether hydrogen sulfide was a "hazardous material" based on 42 U.S.C. § 6991(2).

1. "Hazardous Material" Includes Federally Regulated Substances

¶ 63 Substances regulated under 42 U.S.C. § 6991(2), include petroleum and "any substance defined in section 9601(14) of ... title [42] (but not including any substance regulated as a hazardous waste under subchapter III [3] of this chapter)." Defining hazardous substance, 42 U.S.C. § 9601(14) states that "[t]he term 'hazardous substance' means ...

(A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, ... [and] (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C. § 7412]."

a. Hazardous Material Under the Water Pollution Control Act

¶ 64 The Federal Water Pollution Control Act, at 33 U.S.C. § 1321(b)(2)(A), requires the development of

regulations designating as hazardous substances ... such elements and compounds which, when discharged in any quantity into or upon the navigable waters of the United States ..., present an imminent and substantial danger to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, shorelines, and beaches.

Although such a list was created and does contain hydrogen sulfide, *see* 40 C.F.R. § 116.4 (2002), the list is only applicable to substances discharged into or upon navigable waters, *see* 33 U.S.C. § 1321(b)(1). Such is not the case here.

b. Hazardous Material Under the Clean Air Act

¶ 65 Similarly, 42 U.S.C. § 7412, which deals with hazardous air pollutants, is also inapplicable. In 42 U.S.C. § 7412(r)(3), the statute requires the creation of a list of hazardous air pollutants containing substances that "are known to cause or may reasonably be anticipated to cause death, injury, or serious adverse effects to human health or the environment." Although the statute originally required "[t]he initial list [to] include ... hydrogen sulfide," *id.*, in 1991, Congress deleted "Hydrogen sulfide" from this Act's list of hazardous air pollutants. Act of Dec. 4, 1991, Pub.L. No. 102–187, 105 Stat. 1285. Because hydrogen sulfide no longer meets the statutory definition of a hazardous air pollutant, the federal statute does not support a conclusion that it constitutes a "hazardous material."

---

accordance with its own plain language, to *"all* governmental entities."

3. 42 U.S.C. §§ 6921–6939e, which governs materials defined as "hazardous waste."

### 2. Utah's Regulatory Definition of "Hazardous Material"

¶ 66 Having determined that hydrogen sulfide does not qualify as a hazardous material under section 19–6–302(7) by virtue of it being a substance regulated under 42 U.S.C. § 6991(2), I next turn to the question of whether hydrogen sulfide qualifies as a hazardous material under section 19–6–302(7) by virtue of it being a "hazardous waste as defined in the Utah Hazardous Waste Management Regulations." Utah Code Ann. § 19–6–302(7). The Utah Hazardous Waste Management Act, Utah Code Ann. § 26–37–1, was repealed in 1981, 1981 Utah Laws 126, § 1, and was replaced by the Utah Solid and Hazardous Waste Act, Utah Code Ann. § 19–6–101 to –123 (1998 & Supp.2002). The hydrogen sulfide at issue here constitutes hazardous waste under section 19–6–302(7) if it falls within the Utah regulatory definition of hazardous waste.

¶ 67 The Utah Solid and Hazardous Waste regulations define hazardous waste to be "[a] solid waste as defined in section R315–2–2." Utah Admin. Code R315–2–3(a) (2000). "Solid waste" is defined as "any discarded material that is not excluded by subsection R315–2–4(a)." Id. at R315–2–2(a)(1). Discarded material excluded by subsection R315–2–4(a) from the definition of solid waste includes "[d]omestic sewage or any mixture of domestic sewage and other wastes that passes through a sewer system to a publicly-owned treatment works for treatment. 'Domestic sewage' means untreated sanitary wastes that pass through a sewer system." Id. at R315–2–4(a)(1). Although it is not defined in the Utah Solid and Hazardous Waste regulations, "sanitary waste" is elsewhere defined in the Water Quality regulations as

liquid or solid wastes originating solely from humans and human activities, such as wastes collected from toilets, showers, wash basins, sinks used for cleaning domestic areas, sinks used for food preparation, clothes washing operations, and sinks or washing machines where food and beverage serving dishes, glasses, and utensils are cleaned. Sources of these wastes may include single or multiple residences, ho-

tels and motels, restaurants, bunkhouses, schools, ranger stations, crew quarters, guard stations, campgrounds, picnic grounds, day-use recreation areas, other commercial facilities, and industrial facilities provided the waste is not mixed with industrial waste.

Id. at R317–7–2.44. If the hydrogen sulfide vented by the District was domestic sewage, then it was not a solid waste and is therefore excluded from the regulatory definition of hazardous waste. However, there is a dispute among the parties as to the origin of this hydrogen sulfide. Since the hydrogen sulfide vented by the District is not one of the substances regulated by 42 U.S.C. § 6991(2), and factual disputes prohibit a determination of whether it fits within Utah's regulatory definition, I cannot conclude as a matter of law that hydrogen sulfide is a hazardous material.

### B. Utah's Statutory Definition of "Hazardous Waste"

¶ 68 The District may retain immunity, however, if the vented hydrogen sulfide was a hazardous waste as defined in the Utah Code. Section 19–6–102(9) of the Utah Code defines "hazardous waste" as

a *solid waste* or combination of solid wastes other than household waste which, because of its quantity, concentration, or physical, chemical, or infectious characteristics may cause or significantly contribute to an increase in mortality or an increase in serious irreversible or incapacitating reversible illness or may pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, disposed of, or otherwise managed.

Utah Code Ann. § 19–6–102(9) (1998) (emphasis added). Section 19–6–102(17)(a) defines "solid waste" and specifically excludes "solid or dissolved materials in domestic sewage." The District concedes that its "analysis suggested that the hydrogen sulfide gas and the accompanying smell might [have been] caused by a back-up of gas in the sewage system." The District maintained, however, that the hydrogen sulfide may have

originated from other sources and that it did not fit within the definition of domestic sewage. The Lovendahls argue that it was plainly domestic sewage. Since the hydrogen sulfide vented by the District might have originated from one of a number of sources, there is a disputed material fact concerning the origin of the vented hydrogen sulfide. Because of this dispute, I also cannot conclude that the hydrogen sulfide vented from the elementary school was "hazardous waste." Based on my examination of the statutory definition of both "hazardous material" and "hazardous waste," I cannot conclude as a matter of law that the hydrogen sulfide at issue constituted hazardous material or hazardous waste. Therefore, I conclude that the trial court erred in granting summary judgment.

■ ¶ 69 In sum, under the plain language of subsection 63–30–10(18)(c), the District is entitled to immunity from the Lovendahls' suit if the hydrogen sulfide constituted hazardous material or hazardous waste as a matter of law. However, summary judgment is inappropriate on the issue of immunity because there are disputed material facts concerning whether the hydrogen sulfide vented by the District qualifies as hazardous material or hazardous waste. For this reason, I would reverse the trial court's decision granting the District's motion for summary judgment on this issue.

¶ 70 Justice RUSSON and Justice WILKINS concur in Associate Chief Justice DURRANT's concurring and dissenting opinion.